

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-26-2000

# EP Medsystems Inc v. Echocath Inc

Precedential or Non-Precedential:

Docket 98-6461

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"EP Medsystems Inc v. Echocath Inc" (2000). *2000 Decisions.* Paper 259.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/259

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed December 26, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 98-6461

EP MEDSYSTEMS, INC.,
      Appellant

v.

ECHOCATH, INC.

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil No. 97-cv-04926)
District Judge: Hon. Alfred J. Lechner, Jr.

Argued December 6, 1999

Before: SLOVITER, ROTH and COWEN, Cir cuit Judges

(Filed: December 26, 2000)

      John J. Murphy, III (Argued)
      Stradley, Ronon, Stevens & Young,
      LLP
      Cherry Hill, New Jersey 08002

       Attorney for Appellant

      Richard G. Primoff (Argued)
      Rubin Baum Levin Constant &
      Friedman
      New York, New York 10112

       Attorney for Appellee

OPINION OF THE COURT

SLOVITER, Circuit Judge.

EP MedSystems, Inc. appeals the dismissal with
prejudice of its securities action against EchoCath, Inc.
According to the complaint, the Chief Executive Officer of
EchoCath enticed MedSystems into investing $1.4 million
in EchoCath by assuring MedSystems that lengthy
negotiations had already taken place with four prominent
companies to market certain new EchoCath products and
that contracts with these companies were "imminent."
Relying on cautionary language contained in several public
documents filed by EchoCath with the Securities Exchange
Commission, the District Court held that these
representations, as well as other r elated representations,
were immaterial as a matter of law under the"bespeaks
caution" doctrine and the general test for materiality. It also
held that MedSystems failed to adequately plead scienter,
reasonable reliance, and loss causation and could not do
so. It accordingly dismissed the complaint without leave to
amend.

Our review of a decision granting a motion to dismiss is
plenary. We must accept as true all the factual allegations
in the complaint. See United States v. Gaubert , 499 U.S.
315, 327 (1991).

I.

BACKGROUND

The following facts are drawn largely fr om the amended
complaint and the documents attached to the pleadings by
the parties, including several EchoCath public filings with
the Securities Exchange Commission (SEC).

EchoCath is a small New Jersey research and
development company engaged in developing,
manufacturing, and marketing medical devices to enhance
and expand the use of ultrasound technology for medical

applications and procedures. Among the products that EchoCath has developed with the company's proprietary ultrasound technology are ColorMark, which highlights metallic objects such as needles and other interventional instruments in color to permit them to be seen on existing ultrasound imaging screens, and EchoMark, which electronically marks and displays the position of non-metallic objects such as catheters within the body. The parties refer to these two products as the"women's health products." EchoCath describes its women's health products as enabling physicians to perform procedures such as needle biopsies, catheterizations, and intravascular imaging more safely and efficiently.

EchoCath consummated its initial public offering on January 17, 1996 and issued a lengthy Prospectus that included details of the company's technologies, future plans, capitalization, collaborative agreements, and selected financial data. The Prospectus also included the caution that "[a]n investment in the securities offered . . . is speculative in nature and involves a high degree of risk," App. at 81, and set forth several pages of risk factors. In particular, EchoCath cautioned investors that the company "intend[ed] to pursue licensing, joint development and other collaborative arrangements with other strategic partners . . . [but] [t]here can be no assurance . . . that the Company will be able to successfully reach agreements with any strategic partners, or that other strategic partners will ever devote sufficient resources to the Company's technologies." App. at 84.

More than six months after the public offering, MedSystems began consideration of a sizable investment in EchoCath. MedSystems is itself a small company involved in the development, marketing, and sales of cardiac electrophysiology products used to diagnose and treat certain cardiac disorders. See Amended Complaint P 5. In August 1996, the chief executive officers of the two companies met at EchoCath's plant in Monmouth Junction, New Jersey, where MedSystems management toured EchoCath's facilities to evaluate the technology under development. See id. P 9.

3

Frank DeBernardis, the Chief Executive Officer (CEO) of EchoCath, made a lengthy presentation during the August meeting to David Jenkins, MedSystems President and CEO, James Caruso, its Chief Financial Officer (CFO), and Anthony Varrichio, a Director. See id. PP 9, 10. DeBernardis represented that EchoCath had engaged in lengthy negotiations to license its products and was on the verge of signing contracts with a number of prominent medical companies, which he identified as including Ur oHealth, Johnson & Johnson, Medtronic, and C.R. Bar d, Inc., to develop and market EchoCath's women's health pr oducts. See id.

Negotiations between MedSystems and EchoCath commenced "in earnest" in November 1996. See id. P 12. Throughout the negotiations and until the closing in February 1997, EchoCath's CEO continued to r epresent to MedSystems officials that EchoCath was actively moving forward with the line of women's health pr oducts described in the August meeting, see id., and that the contracts with UroHealth, Johnson & Johnson, Medtronic and C.R. Bard to develop these products were "imminent," see id. P 15. The complaint points to a specific telephone conversation between December 16 and December 20, 1996 during which EchoCath's CEO DeBernardis r eiterated these representations to the CFO of MedSystems. See id. P 12.

On December 20, 1996, DeBernardis deliver ed a group of documents to MedSystems, which included the pr eviously issued 1996 EchoCath Prospectus and EchoCath'sfinancial projections and marketing plan for fiscal years 1997 and 1998 entitled "EchoCath's Operating Model." See id. PP 13, 14. The Operating Model "outline[d] the sales and marketing goals for the next two years (February 1996 – January 1998)." App. at 29. It projected sales from the women's health products of $852,000 in 1997 ($736,000 for ColorMark and $116,000 for EchoMark) and $3,286,000 in 1998 ($2.5 million for ColorMark and $786,000 for EchoMark) and represented that these sales projections were "conservative" estimates. App. at 19. The Operating Model contained the statements that the Model "is intended as a beginning guide, and it is expected that it will be revised," and it is "a simplified for m of accounting" but it

4

"does reflect accurately cash and incomeflows." App. at 19, 29. The Operating Model included the statement that"[t]his Model is driven by a number of assumptions." App. at 19.

The Operating Model also stated that EchoCath expected other income in 1996 and 1997, including $450,000 in the form of license fees and Milestone payments fr om Medtronic, arising out of a licensing agr eement EchoCath had with Medtronic for the use of leads with permanent pacemakers and defibrillators, a grant of $560,000 from the National Institute of Health, and $500,000 fr om another company interested in using the EchoMark technology. App. at 19. In the same paragraph, it noted that "[n]egotiations for these contracts ar e in process." App. at 19.

In an additional communication to MedSystems on December 23, 1996, this one by Daniel Mulvena, the Co-Chairman of EchoCath's Board, EchoCath stated that it anticipated that other outside investment in the company would provide sufficient operating funds to allow EchoCath to actively develop the women's health products for at least 18 to 24 months. See Amended Complaint P 26.

On February 27, 1997, MedSystems entered into a subscription agreement with EchoCath to pur chase 280,000 shares of preferred EchoCath stock for $1,400,000. See id. P 8. In the agr eement, MedSystems specified that it "ha[d] not relied upon any representation or other information (oral or written) other than as contained in documents or answers to questions so furnished to [MedSystems] by [EchoCath]," that it had "relied on the advice of, or has consulted with, only its own Advisors," and acknowledged that "an investment in the Shar es involves a number of very significant risks and [MedSystems was] able to bear the loss of its entire investment." App. at 63. Nonetheless, MedSystems alleges in the complaint that it relied on the r epresentations from EchoCath's CEO of imminent contracts, the for ecasted sales, the expected fees and payments referr ed to in the Operating Model, and the assurance that EchoCath would have sufficient liquidity to continue operation for 18 to 24 months. See Amended Complaint P 32.

5

In the fifteen months after MedSystems made its investment, EchoCath failed to enter into a single contract or to receive any income in connection with the marketing and development of the women's health products. It also did not receive the expected payments fr om license fees. See id. P 25. In September 1997, EchoCath advised MedSystems that EchoCath would run out of operating funds in 90 days if new investment in the company was not forthcoming. See id. P 27.

MedSystems filed suit in the United States District Court for the District of New Jersey, alleging that EchoCath intentionally or recklessly made misrepr esentations to MedSystems in connection with the sale of securities in an effort to induce MedSystems to purchase its securities, in violation of Section 10 of the Securities Exchange Act of 1934, 15 U.S.C. S 78j, and Rule 10b-5. See id. PP 30, 35. MedSystems also alleged a supplemental state law fraud claim. MedSystems alleged that EchoCath was not on the verge of signing contracts with any company to develop its line of women's health products in August of 1996, or any other time up to the closing on February 27, 1997. See id. P 17. MedSystems also alleged that EchoCath knew when it drew up the Operating Model that it was highly unlikely the company would meet the performance r equirements on which the Milestone payments were contingent. See id. P 22. It further alleged that EchoCath made this misleading projection in an effort to conceal EchoCath's true financial condition and to induce MedSystems to invest in the company. See id. P 23.

EchoCath moved to dismiss the complaint under Rule 12(b)(6) and Rule 9(b) of the Federal Rules of Civil Procedure. It attached to its motion: (1) the January 17, 1996 Prospectus; (2) the February 27, 1997 Subscription Agreement between EchoCath and MedSystems for the purchase of the stock; (3) its annual 10-KSB r eport filed with the SEC on December 12, 1996 for the 1996 fiscal year ending August 31, 1996 ("Annual Report"), which reported, inter alia, that as of August 31, 1996, EchoCath's operations had not generated significant r evenues and which contained substantial cautionary language; 1 (4)

_____

1. Among the cautions contained in the Annual Report were statements that "[n]o assurance can be given that the Company will successfully

6

EchoCath's quarterly update filed with the SEC on January 21, 1997 for the three months ending on November 30, 1996 ("Quarterly Report"), which reported that EchoCath had minimal sales in the quarter, and that EchoCath "will receive a series of payments totaling $950,000[from its agreement with Medtronic] after the completion of certain milestones," that its current cash r eserves, together with anticipated sales, should be sufficient to fund r esearch and development and other capital needs through December 1997, that it anticipated additional cash resources that would be provided by the completion of unspecified licensing agreements and strategic alliances, but that there "can be no assurances that the Company will be able to complete the aforementioned license agr eements and strategic alliances on acceptable terms." App. at 214–15. EchoCath took the position that these documents established that any alleged misrepresentations were immaterial under the "bespeaks caution" doctrine because they contained sufficient cautionary language.

The District Court concluded as an initial matter that it was appropriate to examine these documents without transforming the motion to dismiss into a motion for summary judgment, as they were expressly or implicitly relied upon by MedSystems in its complaint. EP MedSystems, Inc. v. EchoCath, Inc., 30 F . Supp. 2d 726, 741–42 (D.N.J. 1998). Although the complaint contains no direct reference to the Annual Report or the Quarterly Report, MedSystems does not contest that decision. There is no indication that MedSystems ever received a copy of these documents, but they were readily available to the public.

The District Court then dismissed the complaint with prejudice. In an exhaustive and lengthy opinion, the court concluded that the representations wer e immaterial as a

_____

commercialize any of its products or achieve profitable operations," that the report contained "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995, and that many known and unknown risks may cause the actual r esults to be materially different from the company's futur e predictions. App. at 157–58.

matter of law under the "bespeaks caution" doctrine because of the cautionary language accompanying these alleged misrepresentations. See id. at 745-51, 760-69. The court also stated that MedSystems had failed to plead scienter with sufficient particularity as r equired by Rule 9(b) and 15 U.S.C. S 78u-4(b)(2). See id. at 751-56. Next, the court found that MedSystems could not have reasonably relied on EchoCath's optimisticfinancial projections. See id. at 757-60. Finally, the court concluded that MedSystems failed to plead loss causation. See id. at 769-71. Having dismissed the federal securities claim, the District Court declined to retain jurisdiction over the remaining state law fraud claim pursuant to 28 U.S.C. S 1367(c)(3). See id. at 771-72.

The District Court had jurisdiction over the federal securities claim under 15 U.S.C. SS 77v and 78aa and the state fraud claim under 28 U.S.C. S 1367(a). W e have jurisdiction under 28 U.S.C. S 1291. W e exercise plenary review over the District Court's dismissal of MedSystems' complaint under Rule 12(b)(6). See Wheeler v. T owanda Area School Dist., 950 F.2d 128, 129 (3d Cir. 1991).

II.

DISCUSSION

Section 10(b) of the Securities Exchange Act pr ovides that it is unlawful for any person to "use or employ, in connection with the purchase or sale of any security . . . , any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. S 78j(b). Rule 10b-5 makes it unlawful for a person to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the pur chase or sale of any security." 17 C.F.R. S 240.10b-5(b). Together, these provisions establish a private right of action for plaintiffs to recover for false or misleading statements or omissions of material fact. See In re Advanta Corp. Sec. Litig., 180 F.3d 525, 535 (3d Cir. 1999).

8

Under the legal principles governing actions alleging securities fraud, MedSystems must prove that EchoCath (1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which MedSystems relied; and (5) that MedSystems' reliance was the proximate cause of its injury. See Weiner v. Quaker Oats Co., 129 F .3d 310, 315 (3d Cir. 1997). The District Court relied on these principles, and the precedents applying them, in dismissing MedSystems' complaint as a matter of law.

At the outset, it is important to recognize that there are important distinctions between this case and the usual securities actions for which these principles wer e developed. Although EchoCath, like the companies sued in those cases, sought to sell its securities in the market by an offering accompanied by the January 1996 Pr ospectus, MedSystems does not base its claim on public misrepresentations or omissions that af fected the price of the stock it purchased. Instead, it contends that it was induced to make the substantial $1.4 million investment as a result of personal representations directly made to its executives by EchoCath's executives and that those representations were false and misleading.

In one sense, this action is more akin to a contract action than a securities action, and that may be the claim encompassed in its state law fraud count that the District Court did not consider. However, as MedSystems chose to base its initial claim on the securities law, we cannot fault the District Court for analyzing it as such. Nevertheless, the distinction between the fact pattern alleged here and that in the typical securities cases explains why it is difficult to apply the precedent from those cases to many of the issues. It is like the proverbial difficulty of fitting a square peg in a round hole. While the question whether EchoCath's alleged misrepresentations are immaterial as a matter of law can be readily considered under the pr ecedent, it is far more difficult to do so with the subsequent issues, such as whether MedSystems pled scienter with sufficient particularity, failed to plead reasonable r eliance, and failed to plead loss causation. We consider each of these issues hereafter, keeping in mind throughout not only this

distinction but also that the District Court dismissed the complaint without leave to amend.

A.

General Principles of Materiality

That materiality is a prerequisite to a viable securities action based on a misrepresentation is too well established to require citation. Nor can there be any disagreement as to the general definition of materiality under the securities laws. As the Supreme Court has defined it, a misrepresentation or omitted fact "is material if there is a substantial likelihood that a reasonable shar eholder would consider it important in deciding how to [act]." TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976). Although the TSC Industries case involved a proxy solicitation dispute, the TSC Industries standard of materiality was expressly applied by the Court to the S 10(b) and Rule 10b-5 context in Basic Inc. v. Levinson , 485 U.S. 224, 232 (1988). According to the Court, for a misrepresentation or omission to be material " `there must be a substantial likelihood that the disclosur e of the omitted fact [or misrepresentation] would have been viewed by the reasonable investor as having significantly altered the `total mix' of information made available.' " Id. at 231-32 (quoting TSC Industries, 426 U.S. at 449).

Material representations must be contrasted with statements of subjective analysis or extrapolations, such as opinions, motives and intentions, or general statements of optimism, which " `constitute no mor e than `puffery' and are understood by reasonable investors as such.' " In re Advanta Corp. Sec. Litig., 180 F.3d at 538 (quoting In re Burlington Coat Factory Sec. Litig., 114 F .3d 1410, 1428 n.14 (3d Cir. 1997)). In other words, some statements would not alter the total mix of relevant infor mation available to a reasonable investor. W e have recognized that "[a]lthough questions of materiality have traditionally been viewed as particularly appropriate for the trier of fact, complaints alleging securities fraud often contain claims of omissions or misstatements that are obviously so

10

unimportant that courts can rule them immaterial as a matter of law at the pleading stage." In r e Burlington Coat Factory Sec. Litig., 114 F.3d at 1426.

The materiality requirement has been further refined in recent years. In 1995, Congress enacted the Private Securities Litigation Reform Act (the "Reform Act") because of significant evidence of abuse in private securities litigation, particularly the filing of frivolous suits alleging securities violations designed solely to coer ce companies to settle quickly and avoid the expense of litigation. See S. Rep. No. 104-98, at 4 (1990), reprinted in 1995 U.S.C.C.A.N. 679, 683; H.R. Conf. Rep. No. 104-369, at 31 (1990), reprinted in 1995 U.S.C.C.A.N. 730, 730. The Reform Act contains, inter alia, a statutory safe harbor for forward-looking written or oral statements. 2 Under that provision, an issuer is not liable for a forwar d-looking statement if it is "identified as a forwar d-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual

_____

2. The Act defines "forward-looking statement" to include:

        (A) a statement containing a projection of r evenues, income
        (including income loss), earnings (including earnings loss) per
share,
        capital expenditures, dividends, capital structure, or other
financial
        items;

        (B) a statement of the plans and objectives of man agement for
        future operations, including plans or objectives relating to the
        products or services of the issuer;

        (C) a statement of future economic per formance, including any such
        statement contained in a discussion and analysis offinancial
        condition by the management or in the results of operations
        included pursuant to the rules and regulations of the Commission;

        (D) any statement of the assumptions underlying or  relating to any
        statement described in subparagraph (A), (B), or (C);

        (E) any report issued by an outside r eviewer retained by an
issuer,
        to the extent that the report assesses a forwar d-looking statement
        made by the issuer; or

        (F) a statement containing a projection or es timate of such other
        items as may be specified by rule or regulation of the Commission.

15 U.S.C.A. S 78u-5(i)(1) (West Supp. 2000).

results to differ materially from those in the forward-looking statement." 15 U.S.C.A. S 78u-5(c)(1)(A)(i) (West Supp. 2000). The safe harbor is also available for oral forward-looking statements under certain conditions.3

In this case, the District Court did not rely on, nor did EchoCath cite, the safe harbor provision as a basis for finding the representations at issue immaterial as a matter of law. This may be because the oral misrepr esentations on which MedSystems brought suit were not identified as forward-looking as required by the safe harbor provision. See supra note 3. Instead, the District Court found that the misrepresentations were immaterial under the "bespeaks caution" doctrine as adopted by this court in In re Donald J. Trump Casino Sec. Litig., 7 F.3d 357 (3d Cir. 1993).

Under the "bespeaks caution" doctrine, "cautionary language, if sufficient, renders the alleged omissions or misrepresentations immaterial as a matter of law." Id. at 371. In In re Trump Casino Sec. Litig., we held that a suit brought by a class of investors who pur chased bonds to provide funding for the acquisition and completion of the Taj Mahal, a lavish casino/hotel on the boar dwalk of Atlantic City, could not be maintained because the alleged misrepresentations and omissions in the pr ospectus were accompanied by warning signals in the text of the prospectus that conveyed to potential investors the extreme risks inherent in the venture and the variety of obstacles the venture would face. See id. at 364. We stated that "bespeaks caution" represents new nomenclature, but it "is essentially shorthand for the well-established principle that a statement or omission must be considered in context, so that accompanying statements may render it immaterial as a matter of law." Id.

_____

3. Under the Reform Act, an issuer is not liable for any oral forward-looking statements if (1) the issuer informs the audience that the statement is forward-looking and that actual r esults may differ materially from the predictions; (2) the issuer orally directs the audience
to other "readily available" written documents that contain the additional information about important factors relating to the forward-looking statement; and (3) the identified documents set forth satisfactory cautionary statements. See 15 U.S.C.A. S 78u-5(c)(2)(B) (West Supp. 2000).

Shortly thereafter, in Kline v. First Western Gov't Sec., Inc., 24 F.3d 480 (3d Cir. 1994), we considered application of the "bespeaks caution" doctrine to alleged misrepresentations and omissions in an opinion letter written by a law firm to its client. W e rejected the position that the disclaimers in the opinion letter entitled the law firm to summary judgment. As we stated,"[n]ot just any cautionary language will trigger application of the doctrine. Instead, disclaimers must relate directly to that on which investors claim to have relied." Id. at 489. Quoting In re Trump Casino Sec. Litig., we recognized that:

> [A] vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to pr event misinformation. To suffice, the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions in the pr ospectus which the plaintiffs challenge. 7 F.3d at 371–72.

Id.

Later, in In re Westinghouse Sec. Litig., 90 F.3d 696 (3d Cir. 1996), we reversed the dismissal of a suit based on alleged misstatements in Westinghouse's 1991 Prospectus. The district court had held that the cautionary language in the prospectus rendered the alleged misstatements immaterial under the "bespeaks caution" doctrine. See id. at 707. We held that "notwithstanding the cautionary language" in the prospectus, the alleged misrepresentations about the adequacy of the loan loss reserves likely "would have assumed actual significance to a reasonable investor contemplating the purchase of securities." Id. at 710.

By its terms, the "bespeaks caution" doctrine, like the safe harbor provision in the Reform Act, is directed only to forward-looking statements. When we first r ecognized the doctrine, we stated that "when an offering document's forecasts, opinions or projections are accompanied by meaningful cautionary statements, the forwar d-looking statements will not form the basis for a securities fraud claim . . . ." In re Trump Casino Sec. Litig., 7 F.3d at 371 (emphasis added). In later cases, we confir med that the doctrine only applied to forward-looking statements. See,

13

e.g., Semerenko v. Cendant Corp., 223 F.3d 165, 182 (3d Cir. 2000) (noting that the plaintiffs"maintain that the `bespeaks caution' doctrine is inapplicable, because the statements related to present and historical facts that were capable of verification and, as such, not forwar d-looking" whereas "[t]he defendants . . . characterize the statements . . . as forward-looking, and thus subject to the bespeaks caution doctrine.").

The other courts of appeals have also held that the "bespeaks caution" doctrine only applies to forward-looking statements. See Grossman v. Novell, Inc. , 120 F.3d 1112, 1123 (10th Cir. 1997) (holding "bespeaks caution" doctrine inapplicable to alleged statements relating to the company's increased market share, pace of mer ger integration, and "smooth" merger); In re Stac Elec. Sec. Litig., 89 F.3d 1399, 1408 (9th Cir. 1996) ("By definition, the bespeaks caution doctrine applies only to affirmative, forwar d-looking statements."); Shaw v. Digital Equip. Corp. , 82 F.3d 1194, 1213 (1st Cir. 1996) (explaining that a statement may contain "both a forward-looking aspect and an aspect that encompasses a representation of pr esent fact," and "[t]o the extent that plaintiffs allege that the . . . statement encompasses the latter representation of present fact, and that such a representation was false or misleading when made, the surrounding cautionary language could not have rendered the statement immaterial as a matter of law.") (emphasis omitted); Harden v. Raffensperger, Hughes & Co., Inc., 65 F.3d 1392, 1405-06 (7th Cir . 1995) (refusing to apply "bespeaks caution" doctrine to statement of "hard fact" regarding the company's "plans to restore profitability to its day-to-day operations"); Rubinstein v. Collins, 20 F.3d 160, 167 (5th Cir. 1994) (discussing the"bespeaks caution" doctrine's applicability to "predictive statements"). But cf. Harris v. Ivax Corp., 182 F.3d 799, 805-06 (11th Cir. 1999) (holding that statements made on the last day of a quarter concerning the results for the quarter ar e forward-looking).

We have also recognized that for the"bespeaks caution" doctrine to apply, the cautionary language must be directly related to the alleged misrepresentations or omissions. See Kline, 24 F.3d at 489. Although we have never explicitly held that the cautionary language must actually

14

accompany the alleged misrepresentation or omission, we have noted in many cases that the cautionary language did accompany the representation. For example, in In re Trump Casino Sec. Litig., we evaluated the plaintif fs' "assertion that the Partnership believed the Taj Mahal could meet the obligations of the bonds [set forth in the pr ospectus], [and] also other relevant statements contained in the prospectus." 7 F.3d at 369. W e noted that "an accompanying statement may neutralize the ef fect of a misleading statement." Id. at 372.

In Kline, we pointed out that the opinion letters at issue contained cautionary language but ultimately concluded that the disclaimer did not directly relate to the statements by which plaintiffs claimed to have been misled, and thus we concluded the claim could be maintained. See 24 F.3d at 489–90. Similarly, in In re Westinghouse Sec. Litig., even though the cautionary language appeared in the prospectus, we held that it did not sufficiently negate some of the claims. See 90 F.3d at 709.

EchoCath argues that the cautionary language need not accompany the alleged misrepresentation, citing to our decision in Weiner v. Quaker Oats Co., 129 F.3d 310 (3d Cir. 1997). One of the alleged misrepr esentations was the statement made by the CEO of Quaker Oats at a public meeting on August 4, 1994 that he was "confident of achieving at least 7% real earnings gr owth" in fiscal year 1995. Id. at 313. The district court dismissed this claim, ruling that the projections of earnings growth were per se reasonable and per se immaterial. Although we affirmed the dismissal of this claim, we did so only after finding that a subsequent statement in the 1994 Annual Report that the company is "committed to achieving a real earnings growth of at least 7 percent over time" neutralized the alleged oral misrepresentation. Id. at 321 (emphasis in original). The phrase "over time" inoculated Quaker Oats fr om any claims of fraud based on a decline in earnings gr owth.

EchoCath seeks to draw from Weiner the general proposition that the "bespeaks caution" doctrine applies if the cautionary language in public filings addr esses the substance of the alleged misrepresentations and provokes uncertainty, even if the cautionary language does not

15

accompany or directly negate the misrepr esentations. Weiner cannot stand for that proposition because we specifically noted that the "bespeaks caution" doctrine was only applicable if the forecasts, opinions and projections were accompanied by a meaningful cautionary statement, and the August 4 statement "was accompanied by no such language." See id. at 320. Instead, we held that the earnings growth projection was immaterial as a matter of law under the general test for materiality because after issuance of the Annual Report with its "over time" language, "[n]o reasonably careful investor would find material a prediction of seven-percent gr owth followed by the qualifier `over time.' " Id. at 321.

Notwithstanding our precedent suggesting that the "bespeaks caution" doctrine requir es the cautionary language to accompany the misrepresentation, we need not make such a holding today. Ultimately, this court may recognize such a requirement, but we choose to exercise restraint in that connection because we r ecognize that possible fact scenarios may arise that we cannot now envision. See Grossman, 120 F .3d at 1122 (rejecting notion that cautionary language must accompany the representation at issue).

Nonetheless, the absence of accompanying cautionary language is an important factor in determining the materiality of the misrepresentation. If the representation is so obviously unimportant to an investor that r easonable minds could not differ on the question of materiality, the representation or omission will be immaterial as a matter of law. See Weiner, 129 F.3d at 321. On the other hand, "[m]ateriality is a mixed question of law and fact, and the delicate assessments of the inferences a r easonable shareholder would draw from a given set of facts are peculiarly for the trier of fact." Shapir o v. UJB Financial Corp., 964 F.2d 272, 280 n. 11 (3d Cir . 1992). We turn to consideration of the misrepresentations alleged by MedSystems in light of these general principles to determine if dismissal at the pleading stage should be upheld.

16

B.

Alleged Misrepresentations

1. "Imminent Contracts"

The principal allegation of MedSystems is that EchoCath repeatedly misrepresented the existence of imminent contracts for its women's health products. The complaint alleges that EchoCath's CEO represented that it "had engaged in lengthy negotiations with and was on the verge of signing contracts with a number of companies including UroHealth, Johnson & Johnson, Medtronic and C.R. Bard, Inc. to develop and market [EchoCath's] women's health products." Amended Complaint P 10; see also id. PP 12, 13, 15, 17. MedSystems also alleges that "[t]hr oughout the negotiations and until the closing in February, 1997," EchoCath "continued to represent . . . that EchoCath was actively moving forward with the line of women's health products . . . ." Id. P 12. Allegedly, EchoCath's CEO repeated these assurances to MedSystems' CFO during a telephone conversation between December 16 and December 20, 1996 and again on December 20 when MedSystems was given the Operating Model. See id. PP 12–14. On or about January 30, 1997, EchoCath's CEO further assured MedSystems that "the deals he had promised with outside companies to develop these products were imminent." Id. P 15.

The District Court, referring to this claim as the Possible Contracts Allegation, concluded that this repr esentation was immaterial as a matter of law under both the "bespeaks caution" doctrine and the general test of materiality.4 Applying the "bespeaks caution" doctrine, the court assumed that the imminent contracts repr esentation was forward–looking but never explicitly deter mined that it was. In addition, the court found that the documents containing the cautionary language were "for the most part contemporaneous" with the imminent contracts

_____

4. We note that the District Court discussed the "bespeaks caution" doctrine under its section on reliance, see EP MedSystems, 30 F. Supp. 2d at 760, though the doctrine actually concer ns materiality.

17

representation. EP MedSystems, 30 F. Supp. 2d at 767. It later stated that cautionary language neutralized the alleged misrepresentation "[i]rr espective of the time of issuance of the [documents]." Id. at 769.

As we noted earlier, the "bespeaks caution" doctrine applies only to forward-looking statements. On review, we cannot say as a matter of law that the repr esentation was not a present statement of fact. EchoCath's CEO had told MedSystems that lengthy negotiations with the four companies had already taken place and that the contracts were "imminent." See Amended Complaint P 15. An event is "imminent" if it is "ready to take place." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONAR Y 1130 (1976). A statement by the CEO of EchoCath that contracts with four companies were "ready to take place" may reasonably be construed as a representation about the current state of negotiations between EchoCath and the four companies it had identified. As such, the representation could be reasonably construed by a trier of fact to be a statement of fact rather than a prediction of future events.

This view is consistent with that of other cir cuits. See, e.g., Grossman, 120 F.3d at 1123 (concluding that the "bespeaks caution" doctrine would not apply because the statements at issue contained "then-present factual conditions, or implied background factual assumptions a reasonable investor would regard the speaker as believing to be true."); Shaw, 82 F.3d at 1212-13 (finding a statement that the company's reserves were adequate to cover costs contained both "forward-looking" and "present-oriented" aspects and was therefore not subject to the "bespeaks caution" doctrine); Harden, 65 F .3d at 1405-06 (determining that a statement regar ding the company's "plans" to restore profitability was "a present assertion of fact, i.e., `plans' exist or are being for mulated").

There is also a question whether the cautionary language cited by the District Court was sufficiently pr oximate to the imminent contracts representations to meet the relatedness test established by our precedent. The r epresentations were not accompanied by any cautionary language. The cautionary language referred to by the District Court to have put MedSystems on notice that the contracts might

18

never be consummated was contained in the 1996 Prospectus, published in January 1996 in connection with the initial public offering and given to MedSystems in December 1996. That Prospectus had numer ous cautionary warnings regarding the futur e of EchoCath.5

However, the 1996 Prospectus was published seven months before the August 1996 meeting wher e EchoCath's CEO first made the representation that it was "on the verge of signing contracts" with the four companies. By the time EchoCath gave the Prospectus to MedSystems, over ten months had passed since its initial publication. W e cannot discount the possibility that MedSystems executives would have treated the cautionary language as applicable to the earlier date when the Prospectus was issued. Whatever the state of the negotiations between EchoCath and the four companies when the Prospectus was published in January 1996, the MedSystems executives might have r easonably believed that significant progress in the negotiations had been made in the interim. This may be particularly so when EchoCath's CEO has personally and repeatedly given assurances that four contracts were "imminent."

The District Court found the necessary relatedness because the Prospectus contained repr esentations similar to those made by EchoCath's CEO in the August 1996 meeting. See EP MedSystems, 30 F. Supp. 2d at 747–48. However, the Prospectus contained general language of intentions to make arrangements and agreements with

_____

5. For example, the Prospectus includes the following:

> [EchoCath] has no binding commitments fr om any third parties to provide funds to [EchoCath] . . . [and] there can be no assurance that [EchoCath] will be able to obtain financing from any other sources on acceptable terms. App. at 99.

> [EchoCath] intends to pursue licensing, joint development and other collaborative arrangements with other strategic partners. There can be no assurance, however, that [EchoCath] will be able to successfully reach agreements with any strategic partners, or that other strategic partners will ever devote sufficient resources to [EchoCath's] technologies. App. at 84.

> No assurance can be given that [EchoCath] will ever be able to establish commercial scale manufacturing operations. App. at 84.

19

third parties. Nothing in the Prospectus specifically refers to the imminent contracts with the four companies EchoCath identified in August 1996.

The District Court also cited to cautionary language contained in EchoCath's Annual Report for the fiscal year ending August 31, 1996 and the Quarterly Report for the quarter ending November 30, 1996, which both cautioned investors that there could be no assurance that EchoCath would ever successfully commercialize any of its products or complete any of the expected license agreements or strategic alliances on acceptable terms. The Annual Report was filed with the SEC on December 12, 1996 and pr ovided information as of August 31, 1996, and the Quarterly Report was filed on January 21, 1997 and pr ovided information as of November 30, 1996. Whether they were sufficient to neutralize the initial repr esentation of the four imminent contracts made in the August 1996 meeting is not so obvious as to be decided as a matter of law. Moreover, MedSystems also alleged that EchoCath's CEO repeated his assurance that the four contracts were imminent between November 1996, when the parties began negotiations for the subscription agreement, and February 1997, when the subscription agreement was finally closed. See Amended Complaint P 12. Ther efore, we cannot agree with the District Court that the cautionary language contained in these documents rendered the imminent contracts representation immaterial under the "bespeaks caution" doctrine.

Nor do we agree that dismissal of the complaint should be affirmed under the general test for materiality. The District Court justified dismissal of the imminent contracts claim because "[a]bsent a statement by EchoCath that the contracts would be consummated, such statements, taken in context, are not false and misleading," EP MedSystems, 30 F. Supp. 2d at 748, and cited as support our decision in Weiner. The District Court also held that the 1996 Prospectus put MedSystems on notice of the possibility that the four contracts might not be consummated. Ther efore, according to the court, no reasonable sophisticated investor would view such representations as altering the total mix of information.

20

We find little support in Weiner  where, as discussed above, the claim that was dismissed was based on a public statement of earnings growth projections that was followed by an equally public qualifier. Her e, MedSystems bases its claim on oral representations personally made by EchoCath's CEO to executives of MedSystems fr om August 1996 until its subscription was finalized in February 1997, a qualitatively different situation. A r easonable investor could have viewed these representations as altering the total mix of information.

EchoCath argues that even if MedSystems executives believed that the contracts were imminent in August of 1996, they should have known by February 1997 when the contracts had not been consummated that they could not rely on the veracity of the representation. See Br. of Appellee at 4. On the other hand, MedSystems had r eceived no information from EchoCath during that period to suggest that the contracts would not be consummated. Thus, MedSystems could have reasonably consider ed that there was no change in the information on which the representation was based, inasmuch as EchoCath, which was in a superior position than was MedSystems to ascertain the facts, failed to update its earlier representations. See Weiner, 129 F.3d at 318.

It follows that we cannot agree with the District Court and EchoCath that the imminent contracts repr esentation is immaterial as a matter of law.

2. Sales Projections

The MedSystems complaint states that DeBernar dis, EchoCath's CEO, made representations to MedSystems concerning anticipated income from the"women's health products it had always represented it was committed to marketing and developing." Amended ComplaintP 14. These representations were contained in the Operating Model for the fiscal years 1997 and 1998, which EchoCath delivered to MedSystems in December 1996. Specifically, the Operating Model states: "ColorMark sales ar e projected to be $736,000 in the coming year and $2.5 million in the second year. The EchoMark SSG catheter sales are projected at $116,000 and $786,000 in the 1st and 2nd

21

year, respectively. We believe these sales projections are conservative." App. at 19.

The District Court discussed the sales projections along with the imminent contracts representation, apparently recognizing that the projections would necessarily be based on the consummation of the contracts for the women's health products. We agree with this approach. Ordinarily, sales projections such as these are characterized as forward-looking statements that may fall within the "bespeaks caution" doctrine. See In r e Advanta Corp. Sec. Litig., 180 F.3d at 536. In fact, the pr ojections were accompanied by a number of warnings. The Operating Model stated at the outset that "[t]his Model is driven by a number of assumptions," and warned that"[t]his Model is a simplified form of accounting, but does r eflect accurately cash and income flows." App. at 19. It further stated that the sales and marketing goals outlined were"intended as a beginning guide, and it is expected that [they] will be revised." App. at 29. Such statements could be sufficient to neutralize the materiality of the sales projections in the same document.

However, we do not understand MedSystems to be arguing that its claim can be maintained on the basis of the sales projections independent of the imminent contracts representation. At oral argument, its counsel stated that the sales projections and financial model wer e tied into the representation that these contracts wer e imminent. He further conceded that the sales projections tur n on the validity of that representation and that the imminent contracts representation is by far the most important misrepresentation in this case. Ther efore, we are not prepared to hold that the sales pr ojections are completely immaterial at this pleading stage of the proceeding, as they may reinforce the materiality of the imminent contracts representation.6

_____

6. Because the sales projections are not an independent basis for the action, we need not consider whether they would be actionable under our language in Weiner, where we declined to recognize a per se rule of immateriality for earnings growth projections. See 129 F.3d at 320 n.12. We noted that a per se rule would immunize companies from "the need

22

## 3. Milestone Payment and Other Licensing Receipts

MedSystems also alleged that EchoCath's Operating Model misrepresented the likelihood that it would receive $450,000 in "Milestone payments" under its r ecent contract with Medtronic, and $500,000 from a company that wished to use EchoMark technology for "guiding pr ostrate treatments." Amended Complaint PP 22, 24. Like the imminent contracts, none of the payments eventuated. However, unlike the imminent contracts r epresentation which was made by the CEO of EchoCath personally to MedSystems executives on various occasions, the statements regarding the expected r eceipts cannot be viewed as statements of present fact but rather are forward-looking. The Operating Model described the Milestone payment and other licensing fees as "[o]ther income over the coming two-year period." App. at 19 (emphasis added). The statement is thus akin to the "over time" statement in Weiner which neutralized an earnings growth projection. See 129 F.3d at 321. Indeed, the qualifying language accompanied the representation and we see no reason why the "bespeaks caution" doctrine would be inapplicable. The District Court did not err in holding these statements to be immaterial.

## 4. Sufficiency of Funds

The final misrepresentation alleged in the complaint concerns the statement made on December 23, 1996 by the Co-Chairman of EchoCath's Board to r epresentatives of MedSystems that the investment by MedSystems together with "other outside investments" would pr ovide EchoCath

_____

to speak truthfully about the future." Id.; see also Kline, 24 F.3d at 486 (stating that opinions are actionable under federal securities law if made without a reasonable genuine belief or factual basis); Eisenberg v. Gagnon, 766 F.2d 770, 776 (3d Cir . 1985) ("opinion must not be made with reckless disregard for its truth or falsity") (quotation omitted). MedSystems did allege that EchoCath "did not genuinely believe and ha[s] no reasonable basis to support the projections set forth" in its Operating Model, an allegation that, if proven, will be equally relevant to the representation about the imminence of the contracts upon which this case is based. Amended Complaint P 18.

23

with sufficient operating funds to allow it to actively develop and market the products for at least 18 to 24 months. Amended Complaint P 26. The District Court concluded that this statement was neither misleading nor material when examined in light of cautionary language surr ounding a similar statement in the January 1996 Prospectus. See EP MedSystems, 30 F. Supp. 2d at 751. But nearly a year had passed from issuance of the Prospectus until the representation at issue, which would likely have negated whatever effect might be attributable to the cautionary language in the Prospectus. MedSystems executives could have reasonably believed that new developments had occurred that prompted the Co-Chair man to make that oral representation.

However, we agree with the District Court's conclusion that the representation is not material. As alleged, the representation was of "anticipated" investment in EchoCath -- not guaranteed. Amended Complaint P 26. Unlike the imminent contracts representation, the Co-Chairman's statements did not refer to specific companies (besides MedSystems itself). Nor was this representation repeated over a six-month period. MedSystems was well awar e that it was dealing with a start-up company and should have expected that cash flow would be an issue. No r easonable investor could find that one optimistic statement made by the company's board member affects the total mix of information available to that investor . Therefore, the claimed misrepresentation relating to anticipated sufficiency of funds is immaterial.

To summarize, in applying the materiality principle to the alleged misrepresentations, we conclude that the imminent contracts representation as well as the r elated sales projection do not fall within the "bespeaks caution" doctrine as the District Court held but that they may be viewed by a factfinder as statements of present fact. Therefore, they may not be dismissed as immaterial as a matter of law. On the other hand, the District Court did not err in dismissing the claims regarding the expected r eceipts from other contracts and the anticipated sufficiency of funds, although our analysis differs to some extent fr om the District Court's.

24

C.

Scienter

EchoCath argues on appeal that the District Court correctly held that dismissal of the complaint was also warranted on the ground that MedSystems failed to meet the heightened pleading required for the scienter element in securities fraud cases. Rule 9(b) of the Federal Rules of Civil Procedure, which applies to all complaints filed in federal court, provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). The 1995 Reform Act requires, inter alia, that a "complaint shall, with respect to each act or omission alleged to violate [the Securities Exchange Act], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C.A. S 78u-4(b)(2) (West Supp. 2000). After considering these r equirements, we recently held that it "remains sufficient for plaintiffs [to] plead scienter by alleging facts `establishing a motive and an opportunity to commit fraud, or by setting forth facts that constitute circumstantial evidence of either reckless or conscious behavior.' " In r e Advanta Corp. Sec. Litig., 180 F.3d at 534-35 (quoting Weiner, 129 F.3d at 318 n.8).

The District Court read our decision in In re Westinghouse Sec. Litig., 90 F.3d 696, to hold that we must analyze the allegations of the complaint separately rather than in their totality. We need not decide how In re Westinghouse Sec. Litig. would apply her e. Our earlier conclusion that the representations as to expected receipts from other contracts and the representation as to the anticipated sufficiency of funds are immaterial obviates any need to consider whether these allegations meet the standard for pleading scienter. It follows that we need only analyze the sufficiency of the pleading as to the representation of the imminence of the contracts with four identified companies and the related sales pr ojections.

MedSystems' complaint alleges that "[c]ontrary to EchoCath's repeated representations to EP MedSystems, EchoCath was not on the verge of signing contracts with

25

UroHealth, Johnson & Johnson, Medtronic, C.R. Bard, Inc. or any other company to market and develop a line of women's health products in September, 1996 or at any other time up to the closing of February 27, 1997." Amended Complaint P 17. Moreover,"EchoCath knew at all times relevant hereto that it had no r easonable prospects of entering into the contracts it had identified to EP MedSystems." Id. P 18. The complaint then notes that "EchoCath has failed to entered [sic] in to a single contract and has yet to receive any income fr om the sale of women's health products" since September 1996. Id. P 19 (emphasis in original).

MedSystems argues that these allegations constitute strong circumstantial evidence of conscious misbehavior or recklessness. The District Court, on the other hand, viewed the complaint as merely alleging fraud by hindsight. It is, of course, true that we generally require mor e than a showing that a predicted event did not occur in or der to sustain a claim of fraud. See In re Advanta Sec. Litig., 180 F.3d at 536–37. And in In re Burlington Coat Factory Sec. Litig., 114 F.3d at 1429, we stated that it is not enough for a plaintiff to state that defendants had no reasonable basis for making the representation. However , we believe that when multiple promised events fail to occur, there is a point where a strong inference of fraud can be made. As MedSystems notes, four contracts with independent companies, each characterized as imminent, failed to materialize within a year of the representations. While it is possible that all of these companies discover ed some characteristic of EchoCath or its products that explained why the putative contracts did not materialize, we cannot dismiss the possibility that EchoCath, in an ef fort to coax a substantial investment, did not fairly repr esent to MedSystems the status of its negotiations with these companies.

As we noted earlier, this case presents a factual situation unlike that in our prior precedent and, indeed, unlike those that were the basis for the 1995 Reform Act. The legislative history of the Reform Act makes clear that it was primarily directed at the abuse and misuse of securities class action lawsuits where defendant companies "choose to settle

26

rather than face the enormous expense of discovery and trial." S. Rep. No. 104-98, at 9 (1995), r eprinted in 1995 U.S.C.C.A.N. 679, 688. As the Senate Report states:

> The fact that many of these lawsuits arefiled as class actions has had an in terrorem ef fect on Corporate America. A whole stable of "professional plaintiffs," who own shares--or sometimes fractions of shares--in many companies, stand ready to lend their names to class action complaints.
>
> * * *
>
> The "victims" on whose behalf these lawsuits are allegedly brought often receive only pennies on the dollar in damages. Even worse, long-term investors ultimately end up paying the costs associated with the lawsuits. As the Council for Institutional Investors advised: "We are * * * hurt if a system allows someone to force us to spend huge sums of money in legal costs by merely paying ten dollars and filing a meritless cookie cutter complaint against a company or its accountants when that plaintiff is disappointed in his or her investment."

Id. (footnotes omitted).

MedSystems stands in contrast to the professional plaintiffs who were the focus of the statute. MedSystems invested the substantial sum of $1.4 million in EchoCath. It did so on the basis of personal repr esentations by EchoCath executives to MedSystems officers concer ning negotiations that had occurred and the imminent results expected of those negotiations. MedSystems' complaint is not a "cookie cutter complaint" or a class action brought by shareholders with an insignificant inter est in the company; it is an individual action, based on a transaction arising from direct negotiations between the parties to the action.

It is difficult to see how MedSystems could have pled fraud or scienter with more specificity without having been given the opportunity to conduct any discovery. Her e, the necessary information as to the status of EchoCath's negotiations with the four companies lies in the defendant's hands. In cases prior to the Reform Act, we noted that the

27

pleading standard required by Fed. R. Civ. P. 9(b) could be relaxed "when factual information is peculiarly within the defendant's knowledge or control." Craftmatic Sec. Litig. v. Kraftsow, 890 F.2d 628, 645 (3d Cir . 1990); see also Shapiro, 964 F.2d at 285 (r eversing the dismissal of the complaint and granting the plaintiff an opportunity to state in the complaint that the necessary information is held by the defendant). We acknowledge the Refor m Act's heightened pleading requirement for the defendant's state of mind, but we believe that MedSystems' allegations are sufficient under the particular facts of this case, which is not the typical class action that Congress intended to target.

In analyzing the effect of the Reform Act on pleading scienter, the Second Circuit concluded that the Reform Act "effectively raised the nationwide pleading standard to that previously existing in this circuit and no higher (with the exception of the `with particularity' requir ement)." Novak v. Kasaks, 216 F.3d 300, 310 (2d Cir . 2000). In In re Advanta Corp. Sec. Litig., we noted that Congress essentially adopted the Second Circuit's interpretation. See 180 F.3d at 584. This court's earlier requirement for pleading scienter did not differ materially from that of the Second Circuit. See In re Burlington Coat Factory Sec. Litig., 114 F.3d at 1418. MedSystems has conceded that it does not have information as to the status of the EchoCath negotiations with the four companies, if indeed there wer e negotiations, as it has not had the opportunity to acquire such information. We conclude that will suffice under the Reform Act.

The District Court also found that the cautionary language in the January 1996 Prospectus and EchoCath's Operating Model eviscerated any inference of the requisite intent to commit fraud. However, as we commented earlier, cautionary language in the publicly disseminated Prospectus in January 1996 hardly negates any possible inference of fraud as to personal statements made from August 1996 to February 1997. There is no suggestion that EchoCath ever cautioned MedSystems before it made its investment in February 1997 that there was a change in the status of its four "imminent" contracts. Under these

28

circumstances, we believe that the scienter pleading requirement has been adequately met.

D.

Reliance

It is undisputed that a plaintiff seeking r elief under Rule 10b-5 must show reasonable reliance on a false statement or omission of material fact. See Kline, 24 F.3d at 487-88. MedSystems' complaint alleges that its executives believed the "representations concerning EchoCath's line of women's health products were true and would not have made its substantial investment in EchoCath if it had known these representations were false." Amended Complaint P 16. The District Court treated the imminent contracts representation as involving future pr edictions by EchoCath that contained no guarantee that the contracts would be consummated. The court repeated its position that the representation was contradicted by disclaimers and cautionary language in the 1996 Prospectus, the Annual Report, and the Quarterly Report filed with the SEC. See EP MedSystems, 30 F. Supp. 2d at 758. Thus, the court found that any reliance by MedSystems on the r epresentation was unreasonable as a matter of law.

Our consideration of the District Court's analysis leads us to a conclusion similar to that we reached in our discussion on materiality where we concluded that none of the documents containing cautionary language sufficiently neutralized the materiality of the imminent contracts representation. It follows that reliance on the repeated oral representations by EchoCath's CEO was not unreasonable as a matter of law because of those documents.

In Straub v. Vaisman & Co., Inc., 540 F.2d 591, 598 (3d Cir. 1976), we identified a variety of factors that should be considered in determining whether the plaintiff 's reliance was reasonable. These factors include the existence of a fiduciary relationship, plaintiff 's opportunity to detect the fraud, the sophistication of the plaintiff, the existence of long-standing business or personal relationships, and access to the relevant information. See id. EchoCath argues

29

that MedSystems was a very sophisticated investor and that it should have taken more care to per form due diligence before it signed the subscription agr eement. But, as we noted in Straub, "a sophisticated investor is not barred by reliance upon the honesty of those with whom he deals in the absence of knowledge that the trust is misplaced. Integrity is still the mainstay of commer ce . . . ." Id.

Nor did MedSystems have access to information that would have suggested that the imminent contracts representation was false. Whether MedSystems, after being told by EchoCath's CEO for the second time that contracts with four companies were imminent, should have approached one or more of the four companies and asked for a verification of the present state of negotiations is an issue for the trier of fact, not for a judge ruling on the sufficiency of the pleadings. We cannot say that MedSystems' reliance on the imminent contracts representation was unreasonable as a matter of law.

E.

Loss Causation

Finally, we turn to EchoCath's contention that dismissal was appropriate because the complaint fails to plead loss causation. The Reform Act provides that in a securities law action, "the plaintiff shall have the bur den of proving that the act or omission of the defendant . . . caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C.A. S 78u-4(b)(4) (West Supp. 2000). Although this provision does not deal with pleading, the District Court, describing loss causation as the "causal link between the alleged misrepresentations and the harm incurred when a security is purchased and sold," EP MedSystems , 30 F. Supp. 2d at 770 (quotation omitted), concluded that MedSystems failed to plead loss causation. The court stated that the plaintiff must show that the misrepresentations"caused the decline in value rather than merely inducing the transaction," id. (quotation omitted), and noted that MedSystems did not allege that the value of its investment has declined, but

30

rather "that it has `sustained substantialfinancial losses' as a direct result of the fraudulent misr epresentations [by EchoCath]." Id. at 771 (quoting Amended Complaint P 34).

Before our recent decision in Semer enko v. Cendant Corp., 223 F.3d 165 (3d Cir. 2000), we generally stated that the "misrepresentation must touch upon the reasons for the investment's decline in value." In r e Phillips Petroleum Sec. Litig., 881 F.2d 1236, 1244 (3d Cir . 1989) (citing Huddleston v. Herman & MacLean, 640 F .2d 534, 549 (5th Cir. 1981)). In Semerenko, we equated loss causation with proximate cause, stating that there must be a "sufficient causal nexus between the loss and the alleged misrepresentation." 223 F.3d at 184. The plaintiff class in Semerenko, which is representative of the usual securities case, alleged that it purchased shares at a price that was inflated due to misrepresentations by several directors and officers and that when the truth was made known, the price dropped to its true value. See id. at 185.

The complaint in Semerenko stated:

> [T]he misrepresentations . . . dir ectly or proximately caused, or were a substantial contributing cause of, the damages sustained by plaintiff and the other members of the Class. The misstatements . . . had the effect of creating in the market an unr ealistically positive assessment of Cendant, as well as of its financial condition, causing ABI's common stock to be overvalued and artificially inflated at all r elevant times.

223 F.3d at 186.

The defendants argued that the plaintif f class did not adequately plead loss causation, but we rejected that argument. Drawing all reasonable infer ences in a light most favorable to plaintiffs, we found that an allegation that the misrepresentations "directly or pr oximately caused, or were a substantial contributing cause of, the damages sustained by plaintiff " adequately pled loss causation. Id. Semerenko, which was issued after the District Court decided this case, adopted a practical approach, in effect applying general causation principles.

Some of the other courts of appeals have also adopted a practical view of loss causation. For example, the Eighth

31

Circuit has stated that "[p]laintiffs are not required to meet a strict test of direct causation under Rule 10b-5; they need only show some causal nexus between [the defendant's] improper conduct and plaintiff's losses." In re Control Data Corp. Sec. Litig., 933 F.2d 616, 619 (8th Cir. 1991) (quotation omitted). The Second Circuit similarly held that loss causation "embodies notions of the common law tort concept of proximate causation." AUSA Life Ins. Co. v. Ernst and Young, 206 F.3d 202, 216 (2d Cir. 2000) (quotation omitted). In Ambassador Hotel Co., Ltd. v. Wei-Chuan Investment, 189 F.3d 1017, 1027 (9th Cir. 1999), the Ninth Circuit stated that "the loss causation requirement limits the ability of plaintiffs to recover for losses sustained on the basis of factors unrelated to any misrepresentation or fraud." As the Eleventh Circuit stated in Robbins v. Koger Properties, Inc., 116 F.3d 1441, 1447 (11th Cir. 1997), "the loss causation requirement must be applied on a case-by-case basis."

In considering loss causation, it is important to recognize once again how this case differs from the usual securities action. In the usual securities action, plaintiffs complain because some announcement emanating from the company, whether regarding a tender offer, see Semerenko, 223 F.3d at 169, earnings, see In re Burlington Coat Factory Sec. Litig., 114 F.3d at 1416, projected earnings, see Weiner, 129 F.3d at 312, or the company's financial condition, see In re Westinghouse Sec. Litig., 90 F.3d at 701, fraudulently represented the actual state of affairs. Plaintiffs claim that, as a result, they purchased the securities at a price that was artificially inflated, only to suffer a loss when the true situation was made known. See, e.g., Hayes v. Gross, 982 F.2d 104, 105 (3d Cir. 1992) (involving a claim that defendants knowingly or recklessly misrepresented the company's financial condition, thus artificially inflating the stock price).

This case differs. In this case, MedSystems claims that as a result of fraudulent misrepresentations made in personal communications by EchoCath executives, it was induced to make an investment of $1.4 million which turned out to be worthless.7 None of the cases in this circuit is analogous,
_____

7. While the complaint may not have set forth that damage theory with specificity, MedSystems' counsel clarified its damage theory at the oral argument.

and counsel have not referred us to a similar case in another circuit nor have we found one. It follows that although we take guidance from the language in other cases enunciating general principles, the holdings are to some extent inapplicable here.

The causation issue becomes most critical at the pr oof stage. Whether the plaintiff has proven causation is usually reserved for the trier of fact. See, e.g. , Huddleston, 640 F.2d at 549-50 (reversing for failure to submit causation to the jury). MedSystems' complaint was dismissed at the pleading stage. Although, as noted above, the allegation that it "sustained substantial financial losses as a direct result of the aforementioned misrepresentations and omissions on the part of EchoCath" could have more specifically connected the misrepresentation to the alleged loss, i.e., investment in a company with little prospects, when we draw all reasonable inferences in plaintif f 's favor, we conclude that MedSystems has adequately alleged loss causation.

III.

CONCLUSION

The District Court, in its scholarly opinion leading to its conclusion to dismiss MedSystems' complaint in its entirety as a matter of law, applied the law of the cir cuit as to some of the requirements of a securities action too restrictively. While Congress and some judicial decisions have tended to cabin the large securities class actions that may have been filed without adequate basis, some of the District Court's conclusions do not withstand our analysis. W e are informed by more recent precedent of this court that was not available to the District Court. Moreover , the District Court failed to recognize that this complaint by MedSystems does not fall into the pattern of the usual securities action and that application of certain legal requir ements must be adjusted to fit the particular action.

Specifically, we have concluded that MedSystems' central allegation, that EchoCath's CEO gave MedSystems executives assurances that, after lengthy negotiations,

contracts with four identified companies wer e "imminent" and provided sales projections that wer e an integral part of these assurances, should not have been dismissed. This was a statement of fact in the context in which pr esented by MedSystems' complaint that could be found to meet the requirement of materiality. The allegation that EchoCath knew or had reason to know that this was not the case adequately met the requirement of pleading scienter. A trier of fact could find that reliance was r easonable and that there was the requisite causal connection between the assurances and MedSystems' loss, i.e., its investment.

On the other hand, we have concluded that the District Court did not err in dismissing the allegations as to certain other expected income and anticipated sufficiency of funds because there was qualifying language that should have put a reasonable investor on notice of the risk. It follows that we will reverse the dismissal of the complaint, and also direct reinstatement of the state fraud count.

In remanding to the District Court we do not suggest that it is obliged now to permit a wide ranging discovery effort by plaintiff. We have been influenced to some extent by MedSystems' counsel's statements that limited discovery into the facts surrounding the central allegation should disclose in short order whether there was an adequate basis in fact for the assurances given from August 1996 through February 1997. If there is some evidence that there was inadequate basis for such assurances, then, of course, it becomes an issue for the jury.

For the reasons set forth, we will reverse the order dismissing the complaint and remand for further proceedings in accordance with this opinion. Each party to bear its own costs.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

34