In re ATI TECHNOLOGIES, INC.,
SECURITIES LITIGATION.

No. CIV A. 01–2541.

United States District Court,
E.D. Pennsylvania.

July 23, 2002.

Deborah R. Gross, Law Offices Bernard M. Gross, P.C., Philadelphia, PA, for Plaintiff.

Daniel Segal, Hangley, John S. Summers, Hangley, Aronchick, Segal and Pudlin, Philadelphia, PA, Stuart J. Baskin, Sandra Y. Nishikawa, Tai H. Park, Shearman & Sterling, New York City, for Defendants.

Susan R. Gross, Deborah R. Gross, Law Offices of Bernard M. Gross, P.C., Philadelphia, PA, for Movants.

## MEMORANDUM

DALZELL, District Judge.

Plaintiffs in this putative class action assert a claim of securities fraud under § 10(b) of the Securities and Exchange Act of 1934 ("Exchange Act") against ATI Technologies, Inc. ("ATI"), and under § 20(a) of the Exchange Act against senior officers and directors of ATI, based on controlling persons liability. Plaintiffs allege the defendants made various materially false or misleading statements or omissions which artificially inflated the price of ATI stock, which sharply fell when the true condition of the company emerged.

Before us is defendants' motion to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6) and 9(b) as well as the Private Securities Litigation Reform Act of 1995, 15 U.S.C. §§ 78u–4 and 78u–5. Also before us is a motion of plaintiffs to strike documents presented as exhibits to the defendants' motion to dismiss.

## FACTUAL BACKGROUND

We here recite the allegedly false or misleading statements set forth in the complaint, and the reasons they are alleged to be misleading.[1]

Plaintiffs Jim D. Melis, Douglas J. Brown, Karlis A. Simon, Roy Y. Yih, and Jerome Grossman all bought ATI common stock between January 13, 2000 and May 24, 2000. The corporate defendant, ATI, is a Canadian corporation that designs, manufactures, and markets multimedia graphic components for personal and mobile computers. ATI's common stock

---

1. The complaint to which we refer throughout this opinion is the Consolidated Amended Class Action Complaint the plaintiffs filed on October 12, 2001 (Doc. No. 7).

trades on the NASDAQ stock exchange. The individual defendants are officers and directors of ATI, Kwoy Yuen Ho, President and Chief Executive Officer, James Chwartacky, Vice–President, Financial Administrator, and Chief Financial Officer, and James Fleck, Director. The complaint states that an ATI announcement of May 24, 2000—to the effect that ATI would be reporting lower than expected revenues and a loss for the third quarter, as well as a $57 million dollar inventory write-down—precipitated a fifty percent decline in the price of ATI stock in two days.

Plaintiffs allege that ATI, through its officers and agents, including the individual defendants, made materially false and misleading statements prior to that announcement, specifically between January 13, 2000 and May 24, 2000, that artificially inflated the value of ATI stock. We now canvass these allegedly false and misleading statements.

*Allegedly Misleading Statements and Omissions*

1. *January 2000 Press Release & Announcements*

ATI issued a press release on January 13, 2000 announcing its financial results for the first quarter of the fiscal year 2000, in which it touted its " 'record in revenues' and financial results for the first quarter." Am. Compl. at ¶ 21; Mot. Dismiss, Ex. A (Press Release). The company announced that its earnings met analysts' expectations. Net income for the quarter was said to be $53.6 million, or $0.25 per share, an increase in 26% from net income for the same quarter a year earlier. Inventory reportedly increased to $212 million. *Id.*

The press release heralded that "Sales in the first quarter reflected solid demand for ATI's RAGE 128 and RAGE MOBILITY products, which comprised a greater percentage of corporate revenues than in prior quarters." *Id.* A statement was attributed to President and CEO Kwok

Yuen Ho, " 'Once again we have delivered a strong start to the new year. . . . ATI approaches a bright future with growth prospects not only in our traditional PC business, but in new and burgeoning markets like consumer electronics appliances. We look forward to the year 2000 as these new markets continue to emerge.' " *Id.* at ¶ 22.

ATI hosted a conference call the same day it issued the press release. Defendants Chwartacky and Ho, and other officers of ATI, discussed with analysts, money managers, and large stockholders the performance of ATI during the first quarter and the company's prospects for future earnings. *Id.* at ¶ 23. Defendants projected that gross margins would remain in the low 30% range, which is above industry norms. *Id.* According to the complaint, defendants stated that sales increased 26% over the year-earlier quarter, remained strong, and were on track to increase 25% for the rest of the year. *Id.* Defendants opined that revenue growth of 25% for the fiscal year 2000 could be reached, noted that average selling prices increased in both board and chip categories, and declared that the market's acceptance of ATI's products was "overwhelming" and that, with increased shipments, ATI's market share would increase. *Id.* Finally, defendants reported that inventory had increased to $212 million and was comprised mainly of works in progress and raw materials. *Id.*

In response to a question about ATI's competitors, Ho declared, "We are taking market share from all of [them]." *Id.* at ¶ 24. On January 14, 2000, Ho commented, "[E]verything is under control." *Id.* at ¶ 37.

2. *February 2000 Press Release & Annual Report*

As will be seen later, plaintiffs cite a number of statements from February of

2000 as the predicate for their claim that defendants artificially pumped up ATI's price.

In the Form 40–F Annual Report ATI filed with the SEC on February 2, 2000, "Defendants emphasized the increase in sales in Europe and stated that its RAGE 128 PRO 'allows ATI to maintain gross margins and improve average selling prices over those which would otherwise prevail.'" Am. Compl. at ¶ 50. ATI opined that consolidation in the industry would benefit it because "the merger of [our competitors] supports the long-standing integrated chip and board business model employed by ATI" and that "ATI's technology portfolio is well positioned to target [ ] new market opportunities." *Id.*

In a press release issued the same day, ATI announced that Toshiba had chosen it to supply mobile graphics for Toshiba's new line of mobile personal computers. *Id.* at ¶ 52. In this press announcement, Ho stated, "ATI has become a leading supplier of mobile graphics in a very short time based on the strength of our product." *Id.*

Two press releases soon followed, on February 8 and 14. In the February 8 press release, ATI claimed that it "is now the world's highest volume supplier of mobile graphics," and added,

> "ATI's market leadership of the mobile graphics field has achieved in a very short time by doing what the company does best: building on our computer excellence, focusing on added value for a new market segment, and excelling at execution," said KY Ho, President and CEO, ATI Technologies, Inc. "We will continue to exploit our unique set of strengths as we move progressively into new market beyond our PC."

*Id.* at ¶ 53. The February 14 press release announced that Sony had chosen ATI to supply graphic chips for Sony's new digital set-top box, stating in part,

> "The Sony/ATI collaboration joins the premier brand in home electronics with the leading manufacturer of graphics and video components," said Vincent Win, vice president of OEM Sales, ATI. "ATI is proud that Sony has chosen ATI's graphics for its new set top box. This design win further positions ATI as a key player in the future development of consumer electronics devices, an important emerging market for us in the years ahead."

*Id.* at ¶ 54.

ATI also announced that it planned to acquire ArtX, Inc., a corporation engaged in computer appliance graphics. Compl. at ¶¶ 57–61. ATI acquired ArtX for $453 million payable in ATI stock and stock options, on or about April 5, 2000. *Id.* at ¶ 64. In the February 16 press release announcing the expected ArtX acquisition, ATI stated:

> "This acquisition accelerates the implementation of our long-term strategic plan to be a key supplier to both the PC and consumer electronics industries," said Ky Ho, Chairman and CEO of ATI, "Our reach now encompasses all major types of e-appliances including set-top boxes, game consoles and video playback devices."

*Id.* at ¶ 57. The press release was attached to a Form 6–K filed on February 29 with the SEC and signed by James Chwartacky. *Id.* at ¶ 58. In a conference call publicizing the ArtX acquisition, Vice-President of Corporate Marketing Henry Quan stated in the presence of defendant Ho,

> The e-appliance opportunity rates strong growth. We're banking on the fact that this will be half of ATI's business by the end of the decade.... Without accounting for synergies, the deal will add over $600 million of revenues over the next five years ... There are additional

design wins coming. I know we keep saying this, trust me, you'll see more announcements coming in the next couple of weeks.

*Id.* at ¶ 59. In a press release published on February 25th, ATI reported that by means of the acquisition of ArtX it was able to introduce its integrated S1–370 TL chipset ahead of schedule, and stated, "This is the strongest product in the integrated market and with ATI's sales and distribution strength behind it, we expect to capture a significant share of the value PC market." *Id.* at ¶ 61.

### 3. *April, 2000 Second Quarter Announcements*

Plaintiffs lastly allege misrepresentations in connection with defendants' April, 2000 announcement regarding ATI's second quarter financials for the period ending February 28, 2000.

On April 6, defendants issued a press release and hosted a conference call. They announced that financial results had again met analysts' expectations. For example, second quarter profit had more than doubled from the year before to $51.1 million, or $0.24 per share, as compared with $21.7 million, or $0.10 per share, the year before. Sales were 28% greater than they were the same quarter the previous year. In the conference call, defendants also gave optimistic forecasts. They predicted that gross margins would be in the low 30% range the rest of the year; sales would increase 20 to 25% for the year; the remainder of the year would progress as expected with solid sales and earnings; and system integrator business, a key ATI market, would continue to grow. Defendants reported that ATI had reached 50% market share in the sale of mobile graphics, and inventory had increased to $213 million. When asked by an analyst whether a component shortage existed that would affect ATI's performance over the year, defendant Ho allegedly responded,

"Based on long term business and personal and private relationships, we feel very comfortable we can manage very well." Am. Compl. at ¶¶ 65–67.

The April 6 press release said that "Sales in the quarter was [*sic*] illustrative of good demand for the entire breadth of ATI's product line: both on the desktop and in the mobile segments. In particular, RAGE 128 PRO and RAGE MOBILITY chips and boards comprised a greater proportion of the Company's sales this quarter." *Id.* at ¶ 65. In this press release, Ho also commented, " 'Our second quarter places ATI solidly on track with corporate plans, with strong sales of our newer products including the RAGE 128 PRO and RAGE MOBILITY families. [ ] With such healthy results and our initial successes in e-appliances we are well on the way to becoming the leading semiconductor supplier of both PCs and consumer electronic devices.' " *Id.* at ¶ 66.

*Reasons Offered for Why the Statements are Misleading*

The complaint asserts that these statements hid the true condition of ATI. The reasons the complaint offers for why the statements were misleading fall into four general classes, which we will discuss in turn: (1) problems in marketing and design of the "Rage 4/Rage 128" and "Rage 5/Rage 128 Pro" chips; (2) an impending decline in profits and sales; (3) overvalued inventory; and (4) a global shortage in components.

The cumulative impact of these claimed misstatements may be seen from what happened on May 24, 2000, when ATI announced that it would report lower than expected revenue and a third quarter loss: the price of ATI stock dropped by fifty percent in two days, closing at $16.75 per share on May 23rd and at $8.44 per share at the close on May 25. Am. Compl. at ¶¶ 74, 80.

### 1. "Rage" Graphics Cards

Plaintiffs allege that ATI concealed information about performance problems with Rage graphic cards and portrayed the graphic cards in a misleading light. The complaint states that the graphic cards, Rage 4/Rage 128 and Rage 5/Rage 128 Pro, were major ATI products. Am. Compl. at ¶ 42.

According to a former Hardware and Software Design Manager, sales of Rage 4/Rage 128 were a "disaster." *Id.* at ¶ 43. In April 1999, a memorandum distributed internally and written by Adrian Hartog, former Senior Vice–President of Engineering and current Chief Technology Officer, allegedly discussed Rage 4's poor sales. *Id.*

By the fall of 1999, plaintiffs claim it also became clear that "there was a fairly major issue" with the Rage 5/Rage 128 Pro chip, according to the former Design Manager. ATI made several production runs of the chip. Each successive run generated thousands of unsaleable chips. Although engineering, design, marketing and management employees collaborated to improve the chip, by late fall it became evident that the chip suffered from defects in its physical design and could not compete in the market. After repeated fruitless refabrication, an executive decision was made to halt design and production of Rage 5 pending reevaluation. CEO Ho was, plaintiffs alleged, personally involved in the decision to stay production. Information about cessation of development of Rage 5 is said to come from the former Hardware and Software Design Manager and a former employee who performed research and design in ATI's Pennsylvania's office. *Id.* at ¶¶ 44–45.

In addition to the mid–1999 memo addressing the inability to sell the Rage 4/Rage 128 chip, *id.* at ¶¶ 43, 94, and the halting of production of Rage 5/Rage 128 Pro because the chip was not competitive, *id.* at ¶ 45, plaintiffs claim that ATI had other indications that the Rage chips were not actually enjoying strong sales. The former ATI Design Manager allegedly reports that ATI's revenue on Rage chips during the second quarter 2000 was allocable to shipment to European distributors. The European market is considered inferior to the American market because it generates lower profit margins and sales prices. Not only was the sale of Rage chips disappointing in the United States, according to the former Design Manager, but shortly after ATI targeted European markets, emails came to be circulated suggesting that Rage 4/Rage 128 chips would need to be written off. *Id.* at ¶ 95.

### 2. Projected Profit and Sales

Plaintiffs also maintain that defendants gave false forecasts about profit margins and sales. It should first be noted that "chips are designed to meet customers' forecasted needs." Am. Compl. at ¶ 24. Computer customers "book," or order, chips from manufacturers like ATI six to twelve months ahead of sales. Current bookings are therefore indications of future sales. *Id.* Customers buy chips in bulk, committing to use a chip as the standard component in a computer model line. A computer manufacturer's decision to use a chip is a "design win." *Id.* at ¶ 26. As the complaint explains, "A 'design win' is a decision by a computer manufacturer such as Apple, Dell, Compaq, etc. to use a certain chip in a model line. It ensures a set number of sales for that chip, which could increase exponentially if the model is popular with the market as the manufacturer will likely contract with the same chip supplier for additional 'builds' of that model as well as for the following year's model." *Id.*

The complaint alleges that at the time Ho and others gave optimistic projections about future sales, bookings of chips had in fact declined. *Id.* at ¶¶ 24, 49, 69. Thus

as bookings had declined, so too would future sales. The deterioration in bookings was allegedly due to competitors selling chips of comparable or better quality than ATI at significantly lower prices, especially in Europe. *Id.* at ¶ 24. At the same time ATI was facing difficulties in bringing its Rage 4 and Rage 5 chipsets to market, Nvidia introduced a chip with twice the performance capabilities of ATI chips. That chip, GE–Force, entered the market in early 1999 and "immediately began to take market share and bookings from ATI." *Id.* at ¶ 28. ATI repeatedly lost design win competitions, according to a former Hardware and Software Design Manager. *Id.* at ¶ 26. It had lost several design win contests by June/July 1999. *Id.* at ¶ 27. Two of ATI's major customers switched to other suppliers.

In January of 2000, Apple Computer unveiled at its annual Mac World trade show that it planned to place the video graphic chip of one of ATI's competitors, 3DFX, in its high end computers. *Id.* at ¶ 30. "ATI's loss of this business was a severe blow because it was in the high end segment of the market that a company could achieve high margins. From January 1997 to January 2000, ATI had been the sole graphic card producer for Apple." *Id.*

Hewlett Packard (according to a former ATI Software Engineer), after repeatedly complaining about ATI's defective software design used in video support system drivers, allegedly told an ATI salesperson in the second half of 1999 that it would switch to another vendor. *Id.* at ¶¶ 31–32.

Not only did ATI experience a decline of bookings for the future, problems plaguing production of Rage 4 and Rage 5 increased costs. There were also delays in the delivery of products which threatened relationships with existing customers. *Id.* at ¶¶ 46–47. The complaint describes a component shortage and a spiraling supply of worthless inventory. Plaintiffs state, "because of the problems at the Company with marketing, engineering and design, the Company's margin was falling. Even when sales goals were reduced or met, or came close to being met, the margin the Company realized on the products was disappointing. The decline in margin was discussed internally among employees within the Company." *Id.* at ¶ 48.

All these factors, plaintiffs maintain, undermined future earnings.

### 3. *Inventory*

Plaintiffs next marshal facts that they claim show that ATI materially overvalued inventory. ATI reported $212 million in inventory for the first quarter ending November 30, 1999 and $213 million in inventory for the second quarter ending February 28, 2000. At the close of the third quarter ending May 31, 2000, ATI announced a $64 million inventory write off, amounting to thirty percent of total inventory reported for the second quarter. The complaint alleges that defendants overvalued inventory by failing—in violation of Generally Accepted Accounting Principles (GAAP) and their own stated accounting practices—to write off or discount unusable, obsolete, and otherwise impaired inventory. This inflated inventory, in turn, artificially inflated gross margins, net income, and earnings per share. *Id.* at ¶¶ 89, 93.

According to its stated accounting practices, ATI values inventory at the lower of cost or replacement cost for raw materials, and the lower of cost and net realizable value for finished products and works in process.[2] *Id.* at ¶ 88. By reporting inven-

---

2. GAAP instructs:

A departure from the cost basis of pricing the inventory is required when the utility of

tory without timely recognizing impairment, defendants allegedly deviated from generally accepted accounting standards and thereby misled investors.

The complaint asserts that inventory was impaired during the putative class period, January 13 to May 24, 2000. But rather than recognize the difference in value between the cost of certain goods and finished products and their utility, ATI allegedly deferred recognition of impaired inventory. Plaintiffs rely on the very magnitude of the charge off—$64 million, or 30% of the value of ATI's inventory for the second quarter—as revealing of the reason it did not timely write off. *Id.* at ¶ 101. Plaintiffs recall the ill-starred manufacture of Rage 4/Rage 128 and Rage 5/Rage 128 Pro, which produced a growing pile of defective and unmarketable chips, prompting e-mails to be circulated that Rage 128 inventory needed to be written off. Plaintiffs recount that it is in the nature of chipsets generally that, when a design is overhauled, volumes of unmarketable chips are the byproduct:

> ATI designs its chips in-house which are then fabricated for the Company by a business partner, Taiwan Semiconductor Manufacturing Corporation (TSMC). Before the Company can bring a chip to market, it must go through several reiterations or versions as engineering and design personnel try to create a chip that will meet the expectations of management and sales people. These numerous re-designs create thousands of unsaleable chips which just "sit" in inventory because each design is sent to TSMC to be fabricated. Because TSMC does not fabricate just one chip, but instead does a production run, thousands of chips are produced which the Company cannot sell. . . .

*Id.* at ¶ 41.

Plaintiffs cite factors in the chipset industry that, they say, suggest that the value of inventory declined in the first half of fiscal year 2000 and not just in the third quarter, and thus put defendants on notice of the possibility of impairment. "As ATI has admitted in the Annual Report, the Company operates in an industry characterized by changing market trends, rapid technology changes, frequent product introductions by competitors, supply constraints for components purchased by the Company's customers that are incorporated by such customers with the Company's products and competitive pressures resulting in lower average selling prices for the Company's products. . . ." *Id.* at ¶ 92. The unrelenting rate of technological change suggests, plaintiffs seem to assume, that inventory became obsolete and unmarketable gradually, and not suddenly, during the third quarter.

Despite these alleged signs of inventory impairment and intense competition, and a growing component shortage, ATI's inventory aged. *Id.* at ¶¶ 98–99. Rates of inventory turnover allegedly declined quarter over quarter between financial year 1999 and 2000. The average days in inventory for first quarter 1999 was fifty days, and for first quarter 2000, sixty-seven days; the average days in inventory for second quarter 1999 was fifty-seven days, and for second quarter 2000, seventy-six days. *Id.* at ¶ 99. A former Software Engineer is claimed to have said that

---

the goods is no longer as great as its cost. Where there is evidence that the utility of goods, in their disposal in the ordinary course of business, will be less than cost, whether due to physical deterioration, obsolescence, changes in price levels, or other causes, the difference should be recognized as a loss of the current period. This is generally accomplished by stating such goods at a lower level commonly designated as market.

Am. Compl. at ¶ 90 (quoting Arb 43, Chapter 4, ¶¶ 7–8).

ATI delayed inventory writeoff until May, 2000, and carried obsolete inventory for as long as two years. *Id.* at ¶¶ 75, 97. Half of the inventory writeoff in the period 2000 pertained to inventory disregarded in 1998. *Id.* at ¶ 75.

### 4. *Component Shortage*

The last reason plaintiffs argue the statements of ATI were misleading is that defendants allegedly concealed from the investing public information about a worldwide component shortage. Plaintiffs allege that a critical shortage existed in components that third-party manufacturers produced. Am. Compl. at ¶ 73. By failing to disclose this material industry fact, and relaying optimistic profit and sales forecasts, defendants allegedly misled investors. Plaintiffs point to defendants' statements on May 24, 2000 acknowledging the severe component shortages.

ATI filed a Material Change Report with the SEC on May 24th, which said: "A significant factor behind the revised outlook was a severely constrained supply of components to the computer industry, including such items as CPU's DVD's and capacitors. This caused particular hardships to system builders...." *Id.* at ¶ 77. In a conference call the same day, ATI officers emphasized the severity of the components shortage. *Id.* at ¶ 78; *see also* Tr. of Conference Call of May 24, 2000. In an interview later that day, CEO Ho said, "In the last year the overall environment has been not that good, so some semiconductor manufacturers have cut down their investment, so we have some worldwide component shortages...." Am. Compl. at ¶ 79.

### *ANALYSIS*

#### *Applicable Law*

##### 1. *General Securities Case Standards*

A motion to dismiss tests the legal sufficiency of the complaint. *Holder v. City of Allentown,* 987 F.2d 188, 194 (3d Cir.1993). In considering a motion to dismiss, a court must accept as true the facts alleged in the complaint and view them in the light most favorable to the plaintiffs. *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1420 (3d Cir.1997). A Court may grant a motion to dismiss under Rule 12(b)(6) "only if it is certain that no relief can be granted under any set of facts which could be proved." *Klein v. General Nutrition Company,* 186 F.3d 338, 342 (3d Cir.1999); *see Weiner v. Quaker Oats, Co.,* 129 F.3d 310, 315 (3d Cir.1997).

As is well known, § 10(b) of the Securities and Exchange Act of 1934 makes it illegal to "use or employ, in connection with the purchase or sale of any security ..., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe...." 15 U.S.C. § 78j(b). Rule 10b–5 promulgated thereunder makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading ... in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5(b). Together these provisions "create[ ] liability for false or misleading statements or omissions of material fact that affect trading on the secondary market." *Burlington Coat Factory,* 114 F.3d at 1417.

■ To state a claim under Section 10(b) and Rule 10b–5, plaintiffs must allege that defendants (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which plaintiffs reasonably relied, and (5) that plaintiffs' reliance was the proximate cause of their damages. *See EP Medsystems, Inc. v. EchoCath, Inc.,* 235 F.3d 865,

871 (3d Cir.2000); *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 537 (3d Cir.1999); *Weiner v. Quaker Oats*, 129 F.3d 310, 315 (3d Cir.1997). In their motion to dismiss, defendants only challenge materiality and scienter.

■ Not every misstatement or omission of fact gives rise to liability. The fact at issue must be material. 17 C.F.R. § 240.10b–5(b). A fact is material if there is a substantial likelihood that a reasonable investor would consider it important in making his or her investment decision. *Burlington Coat Factory*, 114 F.3d at 1425; *Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir.2000). "There must be a substantial likelihood that the disclosure of the omitted fact [or misrepresentation] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *EP Medsystems*, 235 F.3d at 872 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)) (alteration in original).

■ Since materiality is a mixed question of law and fact, it typically is a question for the factfinder. *EP Medsystems*, 235 F.3d at 875; *Burlington Coat Factory*, 114 F.3d at 1426. However, "[i]f the representation is so obviously unimportant to an investor that reasonable minds could not differ on the question of materiality, the representation or omission will be immaterial as a matter of law." *EP Medsystems; see also Burlington Coat Factory.*

■ For a material misrepresentation to be actionable under Rule 10b–5, it must be made with conscious or reckless disregard of its falsity. *Advanta*, 180 F.3d at 534. A reckless representation is "one 'involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.' " *Id.* at 535 (quoting *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir.1977)). A complaint that suggests "simple mismanagement," but not "an egregious departure from the range of reasonable business decisions," does not adequately plead recklessness. *Id.* at 540.

■ As an alternative to pleading facts that would constitute circumstantial evidence of recklessness or conscious behavior, a plaintiff may establish scienter by "alleging facts establishing a motive and an opportunity to commit fraud." *Id.* at 535.

■ Because a private cause of action under Section 10(b) and Rule 10b–5 sounds in fraud, a securities law complaint must satisfy the heightened pleading standard of Federal Rule of Civil Procedure 9(b). *Burlington Coat Factory*, 114 F.3d at 1417. "[T]he circumstances constituting fraud ... must be stated with particularity." Fed.R.Civ.P. 9(b). Plaintiffs must set forth "the 'who, what, when, where and how' " regarding any alleged fraud. *Id.* at 1422 (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.1990)); *Advanta*, 180 F.3d at 534. The pleading requirement "gives defendants notice of the claims against them, provides an increased measure of protection for their reputations, and reduces the number of frivolous suits brought solely to extract settlements." *Burlington Coat Factory*, 114 F.3d at 1418.

### 2. *The PSLRA's Specific Impact on Securities Cases*

The Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u–4, *et seq*, requires a sharp pencil when pleading securities cases. "By establishing a 'uniform and stringent pleading' standard, Congress intended this reform legislation to resolve inconsistencies

among the circuits as to the appropriate pleading standard and to provide added protection against what was perceived as a growing number of frivolous 'strike suits' aimed at achieving quick settlements." *Wilson v. Bernstock,* 195 F.Supp.2d 619, 624–25 (D.N.J.2002) (quoting S.Rep. No. 104–98, at 15 (1995)). "While the PSLRA does not resolve the tension between deterring securities fraud and stymieing meritless suits, it was designed to favor the second consideration." *In re CDnow, Inc. Sec. Litig.,* 138 F.Supp.2d 624, 639 (E.D.Pa.2001), *quoted in Wilson,* 195 F.Supp.2d at 625.

Under the PSLRA, a complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). Moreover, the complaint must "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." *Id.* at § 78u–4(b)(2) (emphasis added).

█ In securities cases, a court must now analyze each statement at issue in order to assess whether each alleged misrepresentation is pleaded with the requisite specificity. *See In re Westinghouse Sec. Litig.,* 90 F.3d 696, 712 (3d Cir.1996); *see, e.g., EP Medsystems v. EchoCath, Inc.,* 235 F.3d 865 (3d Cir.2000); *In re Advanta Corp. Sec. Litig.,* 180 F.3d 525 (3d Cir.1999); *Klein v. General Nutrition Companies, Inc.,* 186 F.3d 338 (3d Cir. 1999); *In re NAHC, Inc. Sec. Litig.,* 2001 WL 1241007 (E.D.Pa.2001); *Wilson v. Bernstock,* 195 F.Supp.2d 619 (D.N.J. 2002). If any alleged misrepresentation is not set out with sufficient particularity, the complaint should be dismissed in whole or part as appropriate. *See* 15 U.S.C. § 78u–4(b)(3)(A).

█ The PSLRA also effected a change in substantive law, establishing a "safe harbor" for "forward-looking statements." *See* 15 U.S.C. § 78u–5(c). The safe harbor immunizes statements that are forward-looking in trajectory[3] "if and to the extent that—

(A) the forward-looking statement is—

(i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or

(ii) immaterial; or

(B) the plaintiff fails to prove that the forward-looking statement—

(i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or

(ii) if made by a business entity;[,] was—

(I) made by or with the approval of an executive officer of that entity; and

(II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading."

15 U.S.C. § 78u–5(c)(1). A careful reading of this provision, and its disjunctive syntax, reveals that a defendant will be immune from liability if *any one* of its criteria is met. *Accord Helwig v. Vencor, Inc.,* 251 F.3d 540, 554–55 n. 2 (6th Cir.2001); *Greebel v. FTP Software, Inc.,* 194·F.3d 185 (1st Cir.1999); *see also Advanta,* 180 F.3d at 537 (granting defendants immunity because plaintiffs failed to plead that statements were made with actual knowledge of falsity under subsection (B)).

---

**3.** A definition of "forward-looking statement" is provided in § 78u–5(i)(2).

*Motion to Strike Exhibits to Defendants' Motion*

We must initially resolve the question of what documents we may consider in ruling on the motion to dismiss.

■■■ Although a motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the complaint, *see Holder,* 987 F.2d at 194, a court may refer to certain documents apart from the complaint. For example, we may judicially notice matters of public record and other facts capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. *Pension Benefit Guaranty Corp.,* 998 F.2d 1192, 1196 (3d Cir.1993); *Oran v. Stafford,* 226 F.3d 275, 289 (3d Cir.2000) (taking judicial notice of properly-authenticated documents filed with the SEC); *Ieradi v. Mylan Labs.,* 230 F.3d 594, 600 n. 3 (3d Cir.2000) (taking judicial notice of opening and closing stock prices on the New York Stock Exchange as reported by Quotron Chart Service). Likewise, a court may consider an undisputably- authentic document integral to or explicitly relied on in the complaint without converting the motion to dismiss into one for summary judgment. *Pension Benefit,* 998 F.2d at 1196; *Burlington Coat Factory,* 114 F.3d at 1426. Were it otherwise, "a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document on which it relied." *Pension Benefit* at 1196. "Plaintiff[s] cannot prevent a court from looking at the texts of the documents on which [their] claim is based by failing to attach or explicitly cite them." *Burlington Coat Factory* at 1426.

In their motion to dismiss, defendants attach the press releases and transcripts of conference calls which plaintiffs have expressly relied upon in their complaint.

They also present: ATI's 1999 Annual Report; a Notice of Management and Proxy Circular for the January, 2000 annual meeting of shareholders; and a form reporting insider trades filed with Canadian regulatory authorities. Under governing circuit law, our reference to these documents is permissible, and even desirable, in order to analyze whether the statements the plaintiffs feature in the complaint are actionable under Section 10(b) and satisfy Fed.R.Civ.P. 9(b) and the PSLRA's pleading and substantive standards. Reference to these documents is necessary to assess defendants' statements in context, and to consider whether statements that are misleading in isolation are accurate or immaterial in their entirety.

A dispute has arisen as to four of the documents. Plaintiffs maintain in their "Motion to Strike Exhibits B, I, M and N to the Baskin Affidavit [4]" that a purported ATI regulatory filing detailing insider stock trades is not signed and stamped as filed. Plaintiffs also maintain that the three asserted transcripts of ATI conference calls, on January 13, April 6, and May 24, 2000, are not duly authenticated. Mem. L. in Supp. Mot. Strike, at 1. They proffer their own transcripts of two of these conference calls, on January 13 and May 24, 2000, which differ from defendants' transcripts, to show that defendants' transcripts are not indisputedly authentic. Letter from Deborah R. Gross, Esq. to the Court (Dec. 17, 2001), Exs. 1 & 2.

We will grant the motion to strike in part. We will not consider Exhibit N, the form listing insider stock trades filed with Canadian regulatory authorities ("Insider Report") in considering the motion to dismiss. We begin by noting that it is not clear from the document *what* Canadian regulatory agency it was filed with. And as plaintiffs point out, the document is not signed and does not bear a stamp or other

---

**4.** Which is attached to defendants' motion to dismiss.

certification that it was actually filed. Although defendants subsequently have attempted to cure these defects by furnishing the Court and plaintiffs' counsel with a signed copy of the document bearing some sort of certification that it was faxed, we find the meaning and authenticity of the document remain too ambiguous to be of value on the motion to dismiss. Not knowing what regulatory agency it was lodged with, and never having heard of an "Insider Report," we cannot be confident that the document reports all of James Fleck's and Kwok Yuen Ho's transactions. Furthermore, even the supplementary copy of the form the defendants provided us gives no indication that it was indeed filed anywhere. It shows only that it was faxed to some unidentified destination. Because the purported report of ATI insider stock trades is not undisputably authentic, we cannot consult it in ruling on the motion to dismiss. *Pension Benefit,* 998 F.2d at 1196; *Oran,* 226 F.3d at 289. Accordingly, we will strike it.

The conference call transcripts stand on a different footing. No one disputes the conference calls occurred. ATI executives convened these calls with analysts and top investors. At least one of them (January 13, 2000) was broadcast over the World Wide Web. The competing transcripts which the parties proffer differ in virtually no respect. Certainly, plaintiffs do not maintain that they differ in any way pertinent to defendants' motion. The identity of the two independent transcripts gives us confidence that they are indeed authentic transcriptions of the January 13, April 6, and May 24, 2000 conference calls. Concededly, they are drafts. Nevertheless, defendants attempt to rely on them to put the statements plaintiffs illuminate in their complaint in context and point to cautionary forward-looking language that may trigger immunity under 15 U.S.C. § 78u–5. These are legitimate reasons to bring the documents to the Court's attention. *See*

*Burlington Coat Factory,* 114 F.3d at 1426 ("What the rule seeks to prevent is the situation in which a plaintiff is able to maintain a claim of fraud by extracting an isolated statement from a document and placing it in the complaint, even though if the statement were examined in the full context of the document, it would be clear that the statement was not fraudulent."). A plaintiff may not excise a statement from a transcript and then protest when a defendant mobilizes the entire transcript for no other reason than that the transcript is not final.

Accordingly, we deny the motion to strike as to the transcripts of the conference calls. We will consider the transcripts simply to glean the context in which defendants made the allegedly misleading statements and omissions. We will only use the versions of the transcripts of the January 13 and May 24, 2000 conference calls that plaintiffs have supplied us.

*Adequacy of Pleading: Unnamed Sources of Fact*

■ Defendants allege a defect of pleading that, if they are correct, permeates the complaint.

Defendants contend that under the PSLRA if plaintiffs base an allegation that a statement is misleading "on information and belief", they must reveal the identity of all sources of information on which that belief is formed, or the pleading is deficient as a matter of law. At issue is plaintiffs' reliance on unnamed former employees of ATI as sources of information, *i.e.,* a Hardware and Software Design Manager, an employee in the Research and Design Department in Pennsylvania, a Creative Director in the Marketing Department of ATI's Toronto home office, and a Software Engineer.

The PSLRA provides:

[T]he complaint shall specify each statement alleged to have been misleading,

the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed. 15 U.S.C. § 78u–4(b)(1). Defendants cite *In re Nice Sys. Litig.*, 135 F.Supp.2d 551, 569 (D.N.J.2001), in which the district court held that this language means "the PSLRA requires that Lead Plaintiffs particularize all facts upon which their belief was formed, including the identities of unnamed 'former employees.'"

Our Court of Appeals has never addressed this question of whether the PLSRA's specific pleading requirements now require disclosure of the names of any personal sources of fact. However, the Court of Appeals for the Second Circuit has held that the PSLRA imposes no such *per se* rule. *See Novak v. Kasaks*, 216 F.3d 300, 312–14 (2d Cir.2000). Rather, that Court concluded:

> [P]aragraph (b)(1) does not require that plaintiffs plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based. Rather, plaintiffs need only plead with particularity sufficient facts to support those beliefs. Accordingly, where plaintiffs rely on confidential personal sources but also on other facts, they need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false. More-

over, even if personal sources must be identified, there is no requirement that they be named, provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.

*Id.* at 313–14 (footnote omitted). *Accord In re Campbell Soup Co. Sec. Litig.*, 145 F.Supp.2d 574, 594–96 (D.N.J.2001) (holding that plaintiffs must plead with particularity sufficient facts to support the belief that a statement is misleading); *In re Daimlerchrysler AG*, 197 F.Supp.2d 42, 63–79 (D.Del.2002) (ruling plaintiffs need not identify anonymous sources, but must specify the factual information that comes from the sources and connect the information to the sources).

We find *Novak* persuasive. A complaint to be particularized need not necessarily reveal the names of anonymous sources of fact. As the Court noted in *Novak*, subsection (b)(1) states that "the complaint shall state with particularity all facts on which that belief is formed," but does not refer to *sources* of facts. *Id.* at 313. Moreover, the Second Circuit pointed out that reading 'all' in subsection (b)(1) rigidly produces "illogical results."[5] *Id.* at 314 n. 1. It is enough that a complaint plead with particularity sufficient facts to support a reasonable belief that a statement is misleading.[6] *Id.*

We will therefore not necessarily disregard averments of fact based on anony-

---

**5.** Contrary to the clearly expressed purpose of the PSLRA, it would allow complaints to survive dismissal where "all" the facts supporting the plaintiff's information and belief were pled, but those facts were patently insufficient to support that belief. Equally peculiarly, it would require dismissal where the complaint pled facts fully sufficient to support a convincing inference if any known facts were omitted.
*Novak*, 216 F.3d at 314 n. 1.

**6.** "[T]his standard achieves (i) Rule 9(b)'s goals of providing defendants with fair notice of the claims against them and the factual basis of those claims, as well as (ii) the PSLRA's goal of flushing out suits which are built on mere speculation and conclusory allegations and which aim to use discovery as a fishing expedition to substantiate frivolous claims." *Campbell Soup*, 145 F.Supp.2d at 595 (citation omitted).

mous sources. The averments are particularized if they provide circumstantial assurance that "a person in the position occupied by the [anonymous] source would possess the information alleged," *id.* at 314, and we will consider them as part of the constellation of facts alleged for why the defendants' statement is false or misleading.

*Motion to Dismiss*

Since it is our obligation on a Rule 12(b)(6) motion to examine the statements identified in the complaint and dismiss the complaint with respect to any statements that do not measure up to the PSLRA's rigorous pleading requirements, we begin by noting that many of the statements identified are immaterial as a matter of law and therefore warrant dismissal.

The defendants' announcement of ATI's quarterly and annual financial performance figures did not amount to material misrepresentations. Apart from inventory—which we address more fully below—the complaint does not claim with any particularity that the reported financials were inaccurate. Therefore, as a matter of law, ATI's announcements of its quarterly and yearly earnings, gross margins, sales, etc., were not material misrepresentations. *See Burlington Coat Factory*, 114 F.3d at 1432 (noting that "accurate report of past successes does not contain an implicit representation that the trend is going to continue"); *Advanta*, 180 F.3d at 538–39 (holding that accurate reports of earnings and other financial successes are not material misrepresentations).

Other statements are merely puffery. As our Court of Appeals has stated,

"[V]ague and general statements of optimism 'constitute no more than 'puffery' and are understood by reasonable investors as such.' Such statements, even if arguably misleading, do not give rise to a federal securities claim because they are not material: there is no 'substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" *Advanta*, 180 F.3d at 538 (citations omitted). ATI gave accurate reports of past successes. Defendants stated that average selling prices increased in board and chip categories. Am. Compl. at ¶ 23. ATI announced that it reached 50% market share for mobile graphic sales. *Id.* at ¶ 67. No facts pleaded in the complaint contradict these reports of past successes, just as no facts pleaded in the complaint contradict ATI's other reports of past successes. ATI's spin on its historical performance, as setting a "record in revenue," *id.* at ¶ 21, conferring a "strong start," *id.* at ¶ 22, and giving ATI "market leadership," *id.* at ¶ 53, is puffery. These self-congratulatory comments would not have significantly altered the mix of information deemed important to a reasonable investor in making its investment decision.

Additionally, no reasonable investor would view as important such bluster as "We are taking market share from all of [them]." *Id.* at ¶ 24. The comment attributed to defendant Ho about first quarter financial results—"At least we don't disappoint: We just meet the expectations. That means everything is under control," *id.* at ¶ 37, is too vague and nonspecific to be of import to any reasonable investor.[7]

---

7. The comment by Henry Quan, Vice–President of Corporate Marketing, that "[t]here are additional design wins coming ...." was not immaterial puffery. *See, e.g., EP Medsystems*, 235 F.3d at 875–78 (comment about "imminent contracts" not immaterial puffery). However, the complaint is bereft of any allegation that there were not additional design wins coming.

*See Burlington Coat Factory*, 114 F.3d at 1427–28 (noting that while expressions of opinion may be actionable if made without a reasonable basis, certain optimistic expressions are too vague to be material); *see also Advanta*, 180 F.3d at 538–39 (discussing positive portrayals coupled with accurate reports of past successes that are immaterial puffery).

■ Finally, the complaint seeks to hold defendants liable for certain alleged omissions of fact that are not actionable under the securities laws because the complaint discloses no reason why the defendants were under a duty to disclose them. The complaint suggests that ATI's press releases about its design wins with Toshiba and Sony were materially misleading because they failed to disclose various design win competitions that ATI lost, and other adverse sales trends at the company. However, nondisclosure information can only give rise to Rule 10b–5 liability under narrow circumstances. "Even non-disclosure of material information will not give rise to liability under Rule 10b–5 unless the defendant had an affirmative duty to disclose that information.... Such a duty to disclose may arise when there is insider trading, a statute requiring disclosure, or an inaccurate, incomplete or misleading prior disclosure." *Oran*, 226 F.3d at 285–86. "There is a duty to disclose information when disclosure is necessary to make defendants' other statements, whether mandatory or volunteered, not misleading." *In re Aetna, Inc. Sec. Litig.*, 34 F.Supp.2d 935, 948 (E.D.Pa.1999). Plaintiffs do not claim that ATI did *not* win the design wins with Toshiba and Sony that the press announcements report. The mere fact that ATI may have lost *other* design win competitions, or even lost business prospects with longstanding customers and experienced other marketing set-

backs, does not *vel non* negate the truth of the press releases, or make them misleading. The press releases gave specific information about specific design wins, and no more. A reasonable investor would not construe them as somehow implying anything greater about ATI's sales, or about other design wins or losses. Therefore, they are not materially misleading. *See Burlington Coat Factory*, 114 F.3d at 1432 (stating that "there is no general duty on the part of a company to provide the public with all material information" and "an accurate report of past successes does not contain an implicit representation that the trend is going to continue").

For the same reason, defendants' alleged nondisclosure of a worldwide shortage in components is not an actionable omission. A "duty to disclose may arise when there is insider trading, a statute requiring disclosure, or an inaccurate, incomplete, or misleading prior disclosure." *Oran*, 226 F.3d at 285–86. As noted, "There is a duty to disclose information when disclosure is necessary to make defendants' others statements, whether mandatory or volunteered, not misleading." *In re Aetna*, 34 F.Supp.2d at 948. Plaintiffs have pointed to no statement rendered misleading by defendants' nondisclosure of the component shortage. The one statement identified in the complaint addressing the component shortage—Ho's comment in response to a question about whether a component shortage would affect ATI's business, that "[b]ased on long term business and personal and private relationships, we feel very comfortable we can manage very well"—was by its terms so vague and qualified that we cannot see how it could mislead investors into believing there was no component shortage,[8] and thus render disclosure of the component

---

8. Not only did Ho not deny the component shortage, but he acknowledged that the sup-

ply of components was tight elsewhere. *See* Tr. of Jan. 13, 2000 Conference Call, at 5.

shortage necessary to cure the misapprehension.[9] Am. Compl. at ¶ 67. Nor does the complaint allege with particularity a statute or insider trading that alternatively may have given rise to a duty to disclose. *Oran,* 226 F.3d at 285.

We come now to statements and omissions that deserve close scrutiny under the securities laws. They are ATI's many comments about Rage 4/Rage 128 and Rage 5/Rage 128 Pro chips; ATI's reports of its inventory levels; and forecasts about economic performance. We examine these three subjects in turn.

### 1. *Representations about Rage 4 and Rage 5*

 The complaint pleads with particularity that public announcements the defendants made about Rage 4 and Rage 5 chips were materially false or misleading and that they were made with scienter, that is, with conscious or reckless disregard for their falsity.[10] The complaint sets forth specific facts showing significant problems that emerged with Rage 4 and Rage 5 design and sales by the fall of 1999.

A former Hardware and Software Design Manager recalls that the sale of the Rage 4 chip was a "disaster." Sales of the chip in the United States was disappointing, and although the company sold the chip in Europe, the European market yields lower profit margins and sales prices than the American market. Emails were circulated at ATI indicating that inventory of Rage 4 chips would need to be written off. A memorandum in April, 1999 by then Vice-President of Engineering and current Chief Technology Officer, Adrian Hartog, addressed the Rage 4 chip's poor sales. The Rage 5 chip experienced problems in the physical chip design. Despite efforts to revamp the chip, it became evident that the chip was unmarketable. CEO Kwok Yuen Ho himself sent instructions to halt designing and manufacturing of the chip so that it could be reevaluated.

Viewed in the light most favorable to the plaintiffs, these detailed facts about the sales and competitiveness of the Rage 4/Rage 128 and Rage 5/Rage 128 Pro chips are enough to demonstrate that the defen-

**9.** It cannot be said that this statement by Ho was itself misleading. The complaint does not contain any factual averments for why the statement was misleading or false, for instance, that ATI did not have the relationships Ho claimed. The mere fact that Ho said he believed the company would manage very well, and the company did not in the end manage very well, does not make the statement by Ho untrue or misleading when made. *Advanta,* 180 F.3d at 538; *Nice,* 135 F.Supp.2d at 586.

**10.** To rehash the representations defendants made about the Rage 4/Rage 128 and Rage 5/Rage 128 Pro chip products, defendants announced in the January 13, 2000 press release, "Sales in the first quarter reflected solid demand for ATI's RAGE 128 and RAGE MOBILITY products, which comprised a greater percentage of corporate revenues than in prior quarters." Am. Compl. at ¶ 21. The company stated in the Annual Report 1999 that Rage 5/Rage 18 Pro "allows ATI to main-

tain gross margins and improve average selling prices over those which would otherwise prevail." Id. at ¶ 50. The April 6, 2000 press release purported, under a sub-headline, "Financial Highlights," "Sales in the quarter was [*sic*] illustrative of good demand for the entire breadth of ATI's product line-up: both on the desktop and in the mobile segments. In particular, RAGE 128 PRO and RAGE MOBILITY chips and boards comprised a greater proportion of the Company's sales this quarter." Mot. to Dismiss, Ex. H, at 2 (Apr. 6, 2000 Press Release). The press release attributed the comment to CEO Ho: " 'Our second quarter places ATI solidly on track with corporate plans, with strong sales of our newer products including the RAGE 128 PRO and RAGE MOBILITY families. [ ] With such healthy results and our initial success in e-appliances we are well on the way to becoming the leading semiconductor supplier of both PCs and consumer electronics devices.' " Am. Compl. at ¶ 66.

dants' representations were false.[11] Defendants described the demand for the Rage chips as "solid," "strong," and "good," when in fact sales of Rage 4 were disappointing and Rage 5 was regarded by ATI's own engineers and marketers as uncompetitive.

 The statements in question were also misleading in that they falsely ascribed ATI's financial successes to the Rage line of chips. Accurately depicting successful financial performance, but attributing the performance to the wrong source, is misleading under the securities laws. *See, e.g., In re Providian Sec. Litig.*, 152 F.Supp.2d 814, 825 (E.D.Pa.2001); *In re Campbell Soup Co. Sec. Litig.*, 145 F.Supp.2d 574, 581, 588–89 (D.N.J.2001). Defendants' statements were not puffery, but provided investors with concrete information about the performance of specific products.

Additionally, it is well here to note that the fact-sensitive inquiry into materiality is ordinarily reserved to the finder of fact. *EP Medsystems*, 235 F.3d at 875; *Burlington Coat Factory*, 114 F.3d at 1426; *In re Aetna*, 34 F.Supp.2d at 945. We therefore cannot resolve materiality adverse to the plaintiffs at this procedural posture.

We also find that the particularized facts give rise to a strong inference of scienter under 15 U.S.C. § 78u–4. The specific facts alleged, if true, would show that CEO Kwok Yuen Ho or other officers of ATI who made the statements about Rage 4 and Rage 5 chips acted consciously, knowing their statements were misleading or false, or embracing an obvious risk that their statements would mislead investors. *Advanta*, 180 F.3d at 539. In particular, Kwok Yuen Ho himself allegedly put the moratorium on designing and manufacturing the Rage 128 Pro chip so that it could be reevaluated. This is significant because Ho's nationwide order to halt building the chip was the culmination of unsuccessful efforts to revamp the chip to remove design flaws that seriously hampered marketability. Since Ho's order was a response, and a drastic one, to these design flaws, it follows that Ho well knew of the problems plaguing the sale of the chip.

### 2. Stated Inventory Levels

As rehearsed, ATI reported inventory valued at $212 million for the quarter ending November 29, 1999 and at $213 million for the quarter ending February 28, 2000. On May 24, 2000, ATI announced an antici-

**11.** As we noted above, the particularized pleading requirements of Rule 9(b) and the PSLRA do not necessarily foreclose use of anonymous sources. Citing with approval *Novak v. Kasaks*, 216 F.3d 300, 312–14 (2d Cir.2000), *In re Campbell Soup Co. Sec. Litig.*, 145 F.Supp.2d 574, 594–96 (D.N.J.2001), and *In re DaimlerChrysler AG*, 197 F.Supp.2d 42, 63–79 (D.Del.2002), we held that unnamed sources of information comport with heightened pleading so long as sufficient information is given "to support the probability that a person in the position occupied by the source would possess the information alleged," *Novak*, 216 F.3d at 314. The question here is whether, if sales of a chip were a "disaster", a Hardware and Software Design Manager would likely know about it. We believe that it is likely a design manager, the anonymous former employee here, would be privy to the information that a chip is selling poorly. Indeed, the complaint states that feedback and cooperation exists between marketing and design employees in developing a chip and bringing it to market. *E.g.* Am. Compl. at ¶ 41 ("Before the Company can bring a chip to market, it must go through several reiterations or versions as engineering and design personnel try to create a chip that will meet the expectations of management and sales people."); *id.* at ¶ 44 ("Because chips are designed six months to one year in advance of reaching market, and are designed to meet anticipated needs or customers' requests, the Company's engineer and design teams must coordinate their development efforts with input from marketing and management."); *see also id.* at ¶ 45 ("Management, marketing and design then completely reworked the [Rage 5] product.").

pated "one-time write down of inventory" of $56 million for the third quarter of 2000, ending May 31, 2000. The write-down ended up being $64 million. The complaint alleges that defendants failed timely to write down impaired inventory during the purported class period, inflating inventory levels, and, in turn, artificially inflating reported gross margins, net income, and earnings per share.

We conclude the complaint alleges sufficiently particularized facts, when viewed in the light most favorable to the plaintiffs, to demonstrate that the defendants materially overstated inventory. We also conclude the complaint gives rise to a strong inference of scienter by alleging specific facts which establish a convincing motive and opportunity to overvalue inventory. These conclusions warrant extended elaboration.

Plaintiffs point to significant worthless inventory generated by the development of Rage 4 and Rage 5. They also allege with particularity severe price cutting by competitors and fierce competition, generally, in the high tech products ATI brought to market. Nevertheless, the company's reported inventory was markedly older in the first and second quarter 2000 than in the year before: the average turnover rate of reported inventory was fifty days and fifty-seven days, respectively, in the first and second quarter 1999, and sixty-seven and seventy-six days, respectively, in the first and second quarter 2000. Inventory thus became older, or at least was carried on the company's books longer, in the first and second quarter 2000, than in the same quarters the previous year. Lastly, plaintiffs note that the magnitude of the inventory write-down, $64 million, or thirty percent of the value of inventory reported the previous quarter, is telling of the failure timely to write off.[12]

Construing these particularized facts in a light favorable to the plaintiffs, the complaint adequately alleges that defendants overvalued inventory when they reported it as $212 million on January 13, 2000 and $213 million on April 6, 2000, by failing to recognize inventory impairment. We cannot say as a matter of law that these alleged misrepresentations were immaterial. After the company announced on May 24, 2000 an expected "one-time write down of inventory of approximately $56 million" and other adverse results for the third quarter, the company's common stock lost half its value. *Oran*, 226 F.3d at 282, 285 (equating movement of stock price to materiality). Furthermore, while the complaint does not say what portion of the $64 million inventory write-down for the third quarter was attributable to the inventory allegedly impaired in early quarters, and what portion was attributable to inventory that became impaired in that quarter, the total magnitude of the write-down was significant in comparison to net income, which

12. We note that the complaint also recites facts about inventory attributable to former unnamed employees, a Software and Hardware Design Manager and a Software Engineer. The complaint alleges, for example, that, according to these former employees, unsaleable Rage 5 chips were recorded on the company's books as "work in progress" and as much as one-half of the third-quarter inventory writeoff pertained to inventory rendered obsolete or discarded two years previously. Am. Compl. at ¶¶ 44, 75. It is not readily apparent to us that a person in the positions these employees occupy would know how inventory is treated by the company's accountants. Thus, as the complaint is devoid of a description of how these employees came to their conclusions about inventory, we must ignore the averments of overvalued inventory that are attributed to them as unparticularized. However, since the complaint contains sufficient independent factual allegations to support the conclusion that inventory was overstated, we still find the complaint adequately pleads material misrepresentations as to inventory. *Novak*, 216 F.3d at 313–14 n. 1.

was a loss of $128.8 million for the third quarter. We cannot pretend that the alleged overvaluation of inventory in the first and second quarters had but a negligible effect on reported earnings. *Burlington Coat Factory*, 114 F.3d at 1427.

Plaintiffs must also plead scienter. A complaint may satisfy scienter by "establishing a motive and opportunity to commit fraud, or by setting forth facts that constitute circumstantial evidence of either reckless or conscious behavior." *Advanta*, 180 F.3d at 534–35 (quoting *Weiner*, 129 F.3d at 318 n. 8). Under the PSLRA, allegations of scienter, whether of circumstantial evidence of consciousness or recklessness or motive and opportunity to commit fraud, must be pleaded "with particularity" and give rise to "a strong inference" of scienter. 15 U.S.C. § 78u–4(b)(2); *Advanta*, 180 F.3d at 535. "Catch-all allegations that defendants stood to benefit from wrongdoing and had the opportunity to implement a fraudulent scheme" will not do. *Id.*

The complaint does not plead facts which establish circumstantial evidence of consciousness or recklessness, sufficient to give rise to a strong inference of scienter. To show that an alleged misrepresentation was made recklessly, a complaint must evidence "not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* (quoting *Sundstrand*, 553 F.2d at 1045). While the complaint here alleges specific facts suggestive of inventory impairment carried on the company's books, but not recorded as such, in the first and second quarter, the complaint does not portray what particular facts defendants were aware of that presented an "obvious" risk of misleading investors and made their behavior amount to "an egregious departure from the range of reasonable business decisions." *Advanta* at 540. The material misrepresentations, if true, signify violations of GAAP. But violations of GAAP, without more, do not constitute circumstantial evidence of recklessness. *Burlington Coat Factory*, 114 F.3d at 1421–22; *Novak*, 216 F.3d at 309.

Nevertheless, the complaint does adequately support a "strong inference" of scienter by showing a powerful motive and opportunity to commit securities fraud. Plaintiffs attempt to premise motive and opportunity on stock sales by officers and directors and on ATI's stock-based acquisition of ArtX. While the first of these allegations is insufficient to support scienter, the second—acquisition of a company for $453 million payable only in company stock and stock options—supplies a strong motive for artificially inflating the value of company stock in order to minimize dilution, as we now show.

As to the stock trades of the various officers and directors of ATI, the complaint mentions the trades of President and CEO Kwok Yuen Ho and Director James Fleck, who sold stock before the announcement of the inventory charge, when the inventory value was allegedly inflated. It is not at all surprising that two officers or directors of ATI sold stock between January 13 and May 23, 2000. Corporate executives are often compensated in stock and will sell their securities in the normal course of business. *Burlington Coat Factory*, 114 F.3d at 1424. While stock sales that are "unusual in scope or timing . . . may support an inference of scienter," *Advanta*, 180 F.3d at 540, "we will not infer fraudulent intent from the mere fact that some officers sold stock," *Burlington Coat Factory*, 114 F.3d at 1424. *See Oran*, 226 F.3d at 290.

The complaint alleges that Director Fleck bought 60,000 shares of ATI common stock on April 6, 2000 and sold all 60,000 shares on April 28, 2000 and May 2, 2000, shortly before the adverse information about inventory and other poor financial results were released and the stock price plummeted. President and CEO Ho, the larger trader, sold 254,000 shares of ATI common stock on April 27 and April 28, 2000. Am. Compl. at ¶¶ 111–12. Viewed charitably,[13] these sales constituted 100% of Fleck's ATI stock holding and 6% of Ho's, meaning that as to Ho more value was invested in the market price of ATI stock after it was allegedly inflated than before. *Advanta,* 180 F.3d at 540–41. The complaint does not disclose the proceeds from the sales,[14] or the size of the proceeds in relation to the individual's compensation. *See Advanta,* 180 F.3d at 540. Nor, importantly, does the complaint reveal Ho's and Fleck's trading activity before the putative class period. *Id.* We cannot discern whether the trading activity was indeed suspicious in timing, coming as it did before disclosure of a large writeoff for inventory and during the period that inventory was allegedly overstated, or whether the trades would appear, in context, to be no departure from the individual's trading patterns in the normal course.

We conclude that Ho's and Fleck's sales of stock in the month preceding the public revelation of an inventory charge off, particularly when the complaint does not disclose how unusual the stock trades were, or whether any other ATI principals sold their stock, is insufficient to support a strong inference of scienter. Put more pointedly, these sales in the month preceding the May 23rd announcement were not suspicious enough in timing or scale to convince us that defendants misrepresented inventory in order to profit from sales of stock. *Cf. Kalnit v. Eichler,* 264 F.3d 131, 139 (2d Cir.2001) (stating "motives that are generally possessed by most corporate directors and officers do not suffice" to show scienter).[15]

The complaint also alleges that ATI acquired the company ArtX in the class period. ATI announced that it agreed to acquire ArtX for $400 million in ATI stock and stock options on February 16, 2000. The acquisition was completed on or about April 5, 2000, for what was ultimately $453 million in stock and stock options. The complaint alleges that ATI had the motive to inflate inventory and other financial results for the first and second quarter to artificially elevate the price of ATI stock to acquire ArtX on favorable terms.

■■■ Stock sales that are unusual in scope or timing may support an inference of scienter. ATI acquired ArtX in the third quarter in an acquisition valued at $453 million. ATI announced poor expected third quarter results, including invento-

---

**13.** We are referring to a document showing Fleck and Ho's holding of ATI common stock as of December 8, 1999, which indicates that Fleck owned no shares of common stock and Ho owned 4,575,640 shares. *See* ATI Technologies, Inc., Notice and Management Proxy Circular for the Annual Meeting of Shareholders, at 70 (Dec. 8, 1999).

**14.** While the complaint is silent, plaintiffs state in their memorandum of law in opposition to the motion to dismiss that the total proceeds made by Ho and Fleck was $9 million. Pls.' Corrected Mem. in Opp. Defs' Mot

to Dismiss, at 41. Our calculation, taking judicial notice of the NASDAQ stock price of ATI common shares at close of trading on the day in question, puts the proceeds at considerably less, $6.1 million.

**15.** To be sure, Fleck's trading in the four weeks cited is eyebrow-raising. But given the PSLRA's stringent pleading requirements, we need to see some flame, not just smoke. As Fleck's trading is presented in a vacuum, we cannot infer a wrong when the PSLRA will not allow such speculation.

ry impairment, less than two months later. ATI acquired ArtX using *only* common stock and stock options as consideration. Thus, the value of the purchase was tied entirely to the price of common stock. Had defendants revealed the true state of inventory prior to the acquisition, the complaint claims that ATI would have had to issue more shares to complete the acquisition, significantly diluting the value of ATI's common stock. For instance, had the deal been made on May 25, 2000, after the disclosure of the inventory expense and other adverse results, when the price of ATI stock fell to $8.4375 a share, ATI would have had to issue over forty-six million common shares and over fifteen million options. By contrast, the company in fact issued 21.5 million common shares and seven million options.

Of course, general claims that officials sought to inflate the price of common stock to "protect, perpetuate and enhance their executive positions" alleges a motive generic to all corporate officials, and fails to explain *why* the officials would enhance their reputations and careers by a temporary artificial inflation in stock price. *Burlington Coat Factory*, 114 F.3d at 1423 n. 12. Here, however, the complaint alleges the defendants materially misstated inventory in the first and second quarter to enable an acquisition to close in the third quarter on favorable terms. The acquisition of ArtX also helped ATI's entry into the burgeoning e-appliance market. Am. Compl. at ¶¶ 19–20, 57–60, 109. Based on the size of the acquisition, and its strategic importance, the complaint adequately alleges that the ArtX acquisition presented a motive and opportunity for fraud.

Given these business realities, it is unsurprising that other courts have found stock-based acquisitions at the time of the alleged misrepresentations support a strong inference of scienter. *See In re Unisys Corp. Sec. Litig.*, 2000 WL 1367951, *5–7 (E.D.Pa. Sept. 21, 2000) (holding stock-for-stock merger, avoidance of cash dividend, and insider trades, satisfy scienter); *Marra v. Tel–Save Holdings, Inc.*, 1999 WL 317103, at *7–9 (E.D.Pa. May 18, 1999) (holding stock-for-stock merger and acquisition using stock as partial consideration satisfy scienter); *Voit v. Wonderware*, 977 F.Supp. 363, 374–75 (E.D.Pa.1997) (finding scienter from stock-based acquisition and insider trades).[16]

### 3. *Financial Performance Forecasts*

■ Plaintiffs also assert that defendants gave the investing public forecasts that were materially false and misleading.

On January 13, 2000, defendants announced to analysts and large investors in a conference call that sales were on track for the balance of the year and would increase about 25% year over year and that revenue growth of 25% year over year could be achieved. Am. Comp. at ¶ 23. On April 6, 2000, in a conference call, which like the January 13th conference call came with an announcement of strong financial results for the quarter, defendants opined that gross margins would stay in the low 30% range for the remainder of the year, sales would increase about 20% to 25% year over year, and the remainder of the year would yield solid sales and earnings. *Id.* at ¶ 67.

**16.** *In re Nice*, on which defendants rely, is distinguishable. There, defendant acquired the company IBS for $1.6 million in stock and $3.9 million in cash. *Nice*, 135 F.Supp.2d at 583. The Court stated, "The quantity of stock used in the IBS transaction ... was not so large as to support the necessary 'strong inference' of scienter." *Id.* Both in terms of the percentage of stock used and sheer size, the acquisition of ArtX is far larger than the acquisition the Court deemed insufficient to give rise to scienter in *Nice*.

In essence, plaintiffs contend that these forecasts were unreasonable when made, as circumstances known to defendants and not disclosed to the investing public undermined any chance they could be realized.

As we will discuss, the complaint adequately alleges particularized facts to support the complaint's allegation that the January 13 and August 6 forecasts of financial results were false or misleading. Nevertheless, because defendants couched the forecasts in ample and meaningful cautionary language, investors were warned of the concrete risks attendant to the projections, and could not have considered the forecasts, even if they were misleading, material. Additionally, the safe harbor provision of the PSLRA, § 78u–5(c)(1)(B), immunizes the defendants from liability because the complaint does not plead with particularity facts raising a "strong inference" that those who made the forecasts had "actual knowledge" of their falsity. *See id* § 78u–4(b)(2).

Of course, predictions are not false or misleading simply because they do not work out. *Burlington Coat Factory,* 114 F.3d at 1431–33; *Advanta,* 180 F.3d at 538. For an expression of opinion about the future to be false under the securities laws, it must lack a reasonable basis when made. *Burlington Coat Factory,* 114 F.3d at 1428; *Weiner,* 129 F.3d at 320. Plaintiffs put forth particularized facts about circumstances existing at the time defendants gave their optimistic projections that threatened to have negative impact on profit margins and sales. The complaint alleges, for instance, that ATI repeatedly lost design win competitions. Major customers defected, including Apple Computer, which switched to a new graphic chip producer for its high-end machines, and whose loss of business was devastating because Apple had previously used ATI as its sole graphic card producer. Competition intensified: Nvidia came out with a two times more powerful chip and competitors significantly slashed prices. A worldwide shortage in components was looming. ATI had problems perfecting such products as Rage 4/Rage 128 and Rage 5/Rage 128 Pro and delivering other products to market on a timely basis. These problems, together, contributed to a decline in bookings for the future. "Bookings" of products are placed six to twelve months ahead of sales, and are a reliable indicator of future sales. These particularized facts adequately demonstrate that defendants' performance forecasts were unreasonable when made. Construing the facts in a light most favorable to the plaintiffs, the complaint suggests that defendants' forecasts about revenue, sales, and profit margins remaining on track were unreasonable when made.

But the forecasts, although they were possibly misleading or false, were not misleading in a material sense. As we have stated, a fact is material if there is a substantial likelihood that an investor would consider it important in deciding how to invest if there is a substantial likelihood that disclosure of the misrepresented or omitted fact would have significantly affected the 'total mix' of information available to the investor. Under the "bespeaks caution" doctrine—a corollary of materiality applicable only to forward-looking statements[17]—"a statement or omission must be considered in context, so that accompanying statements may render it immaterial as a matter of law." *EP Medsystems,* 235 F.3d at 873–74; *In re Donald Trump Casino Sec. Litig.,* 7 F.3d 357, 364 (3d Cir.1993). Cautionary lan-

---

**17.** The "bespeak caution" doctrine remains alive even after Congress's passage of the safe harbor. *See EP Medsystems,* 235 F.3d at 872–875; *In re Home Health Corp. of Amer., Inc. Sec. Litig.,* 1999 WL 79057, at *6–8 (E.D.Pa. Jan. 29, 1999).

guage can neutralize the importance that predictions have for investors. *EP Medsystems,* 235 F.3d at 874. To be effective at doing so, the qualifying language "must be substantive and tailored to the specific future projections, estimates or opinions ... which the plaintiffs challenge." *Trump,* 7 F.3d at 371–72.

In the January 13 and April 6 conference calls, defendants gave the following prefatory language:

> This discussion may involve forward-looking statements that involve risks and uncertainties. Actual results may be materially different from those contained in such forward-looking statements. The market for the company's products is characterized by rapidly changing technology, evolving industry standards, frequent product introductions, new product introductions, emerging competitors and significant price competition. In the event that the company is unsuccessful in maintaining its market position or historic price margins, its results of operations will be adversely affected. Additional information concerning factors that could adversely affect the company's results are contained in the company's filings with the securities regulatory authority.

Tr. of Jan. 13, 2000 Conference Call, at 1 (statement of Joanne Chang); *See also* Tr. of April 6, 2000 Conference Call, at 1 (statement of Joanne Chang).

ATI filed an Annual Report with the SEC on January 5, 2000, delineating other "risks and uncertainties," such as: the importance of design wins; the need for timely introduction of innovative products; the highly competitive market; and the reliance on foundries and other third-party manufacturers for components. ATI Technologies, Inc., Annual Report 1999, at 30–34 (Jan. 5, 2000).

We believe the defendants conveyed to investors the uncertainty of their projec-tions. Defendants also identified specific risk factors. Many of the risks defendants disclosed are indeed the very ones plaintiffs identify in the complaint as actually coming to pass. On the whole, investors were made aware that ATI operates in a competitive and volatile industry in which any prediction is fraught with uncertainty. Investors were given risk factors to evaluate. Given defendants' warnings, we believe any reasonable investor would have inquired further before accepting the company's projections, and discounted the importance of the projections when deciding whether to buy stock. Under the "bespeaks caution" doctrine, the substantial cautionary language neutralized the importance of the defendants' forecasts, rendering them, even if they were misleading, immaterial.

We also note that the determination of materiality takes into account the availability of the misrepresented or omitted information in the public domain. *Klein,* 186 F.3d at 342. Many of the circumstances plaintiffs cite as demonstrating the falsity (or unreasonableness) of defendants' predictions were public information; to take three quick examples, (1) the alleged performance superiority of the Nvidia GE–Force chip; (2) price cutting by competitors; and (3) the tightness in the supply of components, which CEO Ho acknowledged in the January 13th and April 6th conference calls with analysts and large investors, *see* Tr. of Jan. 13, 2000 Conference Call, at 5; Tr. of April 6, 2000 Conference Call, at 5. Investors thus had available to them much of the very information that allegedly belied defendants' optimistic financial forecasts, convincing us further that they were not material.

Finally, the forecasts of revenue, profit margins, and sales are forward-looking statements within the meaning of the safe harbor provision of the PSLRA. *See*

§ 78u–5(i)(1)(A). As such, defendants are immune from liability for them unless plaintiffs can show that those who made them or approved of them had "actual knowledge" of their falsity. § 78u–5(c)(1)(B). The complaint does not make that showing. Nor does it allege particularized facts giving rise to that "strong inference" under § 78u–4(b)(2).[18]

*CONCLUSION*

We have assessed, as we must under the Exchange Act, Rule 9(b), and the PSLRA, whether each alleged misstatement or omission is actionable or merits dismissal. Various misrepresentations alleged are immaterial puffery or lack any factual foundation in averments of the complaint for why they are misleading. Other statements, namely the statements defendants are alleged to have made regarding Rage 4 and Rage 5 and inventory, are pleaded with adequate particularity, and cannot be dismissed on the pleadings. Lastly, while plaintiffs adequately allege that defendants' financial forecasts were false, they cannot premise liability on the forecasts because the forecasts are immaterial under the "bespeaks caution" doctrine and sheltered by the safe harbor of § 78u–5(c)(1)(B). Because the immateriality of the forecasts is a function of context, which here is fully known, we will not allow the futile act of yet another amendment of the complaint.

Defendants only contest the Section 20(a) claims maintained against the individual defendants insofar as they are derivative of the Section 10(b) claim asserted against the corporation.[19] Because the complaint states a claim under Section 10(b) against the corporation as to representations concerning Rage 4 and Rage 5 and inventory, the complaint withstands defendants' efforts to dismiss the Section 20(a) claims as to those representations.

An appropriate Order follows.

*ORDER*

AND NOW, this 23rd day of July, 2002, upon consideration of plaintiffs' Consolidated Amended Class Action Complaint (Doc. No. 7), defendants' motion to dismiss (Doc. No. 9), plaintiffs' response thereto (Doc. No. 12), and defendants' reply thereto (Doc. No. 13), and plaintiffs' motion to

---

18. We decline defendants' invitation to absolve the financial forecasts through the safe harbor provision, § 78u(c)(1)(A)(i),(2). For immunity under that subsection, each forward-looking statement must be "identified as a forward-looking statement." *See* § 78u–5(c)(1)(A)(i),(2)(A)(i). While defendants announced at the outset of the conference calls that "this discussion may involve forward looking statements," they never identified *which* statements were forward-looking statements and which were not. Also, while corporate officials may, consistent with subsections 78u–5(c)(1)(A)(i) and (c)(2), refer listeners in conference calls to written documents containing meaningful cautionary language, they must refer to the documents by "identif[ying] the document, or portion thereof." *Id.* at § 78u–5(c)(2)(B)(ii). Defendants referenced "the company's filings with the securities regulatory authorities" but did not specify the documents or even the regulatory agencies where they could be found.

19. Section 20(a) provides "controlling persons" liability and provides in relevant part:

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). Thus, liability against an individual defendant as a "controlling person" of a corporation is dependent on the liability of the corporation under the securities laws. *Advanta*, 180 F.3d at 541.

strike (Doc. No. 10), defendants' response thereto (Doc. No. 13), the letter of Deborah R. Gross, Esq. dated December 17, 2001 supplemental to the motion to strike, and defendants' supplemental response (Doc. No. 14), and, in accordance with the forgoing Memorandum, it is hereby ORDERED that:

1. The Clerk shall MARK the letter of Deborah Gross, Esq. dated December 17, 2001 as part of the public file;

2. Plaintiffs' motion to strike is GRANTED in that Exhibit "N" is STRICKEN from the motion to dismiss, but the motion to strike is otherwise DENIED; and

3. Defendants' motion to dismiss is GRANTED except as to the alleged misrepresentations and omissions concerning (a) Rage 4/Rage 128 and 5/Rage 128 Pro and (b) inventory.